## In re Anonymous No. 40 D.B. 91

Disciplinary Board Docket no. 40 D.B. 91.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

HILL, *Member,* June 30, 1993—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On April 4, 1991, Office of Disciplinary Counsel, petitioner, filed a petition for discipline against [respondent] which levels eight charges against respondent of violations of the Disciplinary Rules of the Code of Professional Responsibility and the Rules of Professional Conduct.

On May 15, 1991, the respondent filed an answer to the petition for discipline.

On May 30, 1991, by order of the Disciplinary Board, the Honorable [A] was appointed as special master. On August 2, 1991, respondent requested a continuance of the hearing because of the withdrawal of respondent's counsel. On August 6, 1991 the special master approved the withdrawal of respondent's counsel and denied respondent's request for a continuance. A hearing began on August 19, 1991 and continued for several days thereafter.

The special master filed his report and recommended that respondent be disbarred because of the seriousness of the many rule violations and the lack of mitigating circumstances.

On April 8, 1992, petitioner filed a brief on exceptions to the special master's report, and argued that the special master's adoption of the findings of fact of petitioner support a violation of Rule of Professional Conduct 8.4(c).

On April 20, 1992, respondent filed a brief on exceptions. On June 1, 1992, respondent filed an answer to petitioner's brief on exceptions. In his answer, respondent requested that the petitioner's exceptions be dismissed and that the master be ordered to reconvene the hearing to accept evidence on mitigation and exceptions to the findings of fact.

On June 11, 1992, petitioner filed a response to respondent's answer to brief on exceptions. Petitioner asked that respondent's request be denied.

The matter was adjudicated at the July 24, 1992 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## II. FINDINGS OF FACT

The board adopts the following findings of fact noted by the special master, which are amply supported by the evidence, testimony, and stipulations presented by the parties throughout the course of these proceedings:

(1) Petitioner, whose principal office was at that time located at 300 North Second Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules. (P.E. 137, 1.)

(2) Respondent, [    ], Esquire, was born in 1948, admitted to practice law in the Commonwealth of Pennsylvania in 1984, and his office of record is [    ]. (P.E. 137, 2.)

*Charge I ([B]/[C])*

(3) In about June 1985, respondent was retained by [    ] and [    ] [C] to defend them in a civil action in [    ] County initiated by their son, [D] and his wife, [E] and to advance a counterclaim. (P.E. 137, 3.)

(4) In about mid-1986, the [C] moved from Pennsylvania to Florida, and rented their home located at [    ], Pa. to [F]. The [C] listed their home for sale with [G] Realtors, with a contract which expired on April 10, 1987. (P.E. 137, 4.)

(5) In the spring of 1987, respondent made several telephone calls to the [C] in Florida, not solely for the purpose of purchasing their property, but at some point the purchase of their property was discussed. (P.E. 137, 5.)

(a) Respondent's initial offer to the [C] included a large purchase money mortgage. (P.E. 137, 5(a); P.E. 59(a), P.D.E. 1.)

(b) The [C] rejected respondent's offer. (P.E. 137, 5(b); P.E. 59(a), P.D.E. 2.)

(6) Respondent then made another offer to the [C]. Under the new agreement, consideration for the house and adjacent lot was $55,000, a down payment of $1,000 was to be made at the time of signing the agreement, an additional payment in the amount of $39,000 was to be paid to the [C] within 90 days of April 25, 1987, and the balance of $15,000 was to be paid within one year of closing, with interest accruing at a rate of 8 percent. (P.E. 137, 6; P.E. 59(a), P.D.E. 3.)

(7) The [C] accepted respondent's offer and retained the $1,000 down payment. The closing on the property was then scheduled for 90 days later, on July 25, 1987. (P.E. 137, 7.)

(8) Respondent contacted the [C] and advised them that he needed more time because he did not have the necessary $39,000 to close on the property. (P.E. 137, 8.)

(9) On August 14, 1987, respondent and the [C], met at respondent's office. (P.E. 137, 9.) At that meeting:

(a) Respondent asked the [C] to sign a new sales agreement in which total consideration for the property would be $55,000 comprised of: (P.E. 137, 9(a); P.E. 59(a), P.D.E. 4.)

(i) A down payment of $1,000 which had already been paid to the [C]; (P.E. 137, 9(a)(i); P.E. 59(a), P.D.E. 4.)

(ii) An additional payment in the amount of $30,000 to be paid by respondent to the [C] within 60 days of August 14, 1987; (P.E. 137, 9(a)(ii); P.E. 59(a), P.D.E. 4.)

(iii) The balance of $24,000 to be paid by respondent no later than September 1, 1988, with interest accruing at the rate of 8 percent; and, (P.E. 137, 9(a)(iii); P.E. 59(a), P.D.E. 4.)

(iv) Title was to be furnished at the time of settlement, which was upon payment of the $55,000. (P.E. 137, 9(a)(iv); P.E. 59(a), P.D.E. 4.)

(b) The agreement by and between the [C] and respondent and his wife was executed by the [C] and respondent (not respondent's wife) and witnessed by [H], respondent's secretary. (P.E. 137, 9(b); P.E. 59(a), P.D.E. 4.)

(c) Respondent's wife was not present at the time the agreement was entered into and did not then execute the agreement, but she subsequently executed the agreement; and, (P.E. 137, 9(c).)

(d) Respondent acted as the notary public for the execution of the document by the [C]. (P.E. 137, 9(d); P.E. 59(a), P.D.E. 4.)

(10) At that same August 14 meeting, respondent gave to the [C] check no. 579, in the amount of $30,000, which check was drawn on respondent's [I] Federal Credit Union account no. [    ] captioned "[respondent], Attorney at Law" 079 personal account. (P.E. 137, 10; P.E. 59(a), P.D.E. 5.)

(a) The 079 personal account was not a denominated segregated account for client funds. (P.E. 137, 10(a).)

(b) Both respondent and his wife had signatory authority over the 079 personal account. (P.E. 137, 10(b); P.E. 73.)

(11) Additionally, at the August 14 meeting, respondent asked the [C] to execute a mortgage and a note in favor of [J], both of which were dated August 14, 1987. (P.E. 137, 11; P.E. 59(a), P.D.E. 6, P.D.E. 7.)

(a) The mortgage reflected that the [C] gave a mortgage to [J] in the amount of $30,000, with the full debt due and payable on October 31, 1987. (P.E. 137, 11(a); P.E. 59(a), P.D.E. 6.)

(i) The mortgage was on the property owned by the [C], and for which respondent had just entered into an agreement of sale. (P.E. 137, 11(a)(i); P.E. 59(a), P.D.E. 6.)

(ii) The mortgage was signed by the [C], witnessed by [H] and notarized by respondent. (P.E. 137, 11(a)(ii); P.E. 59(a), P.D.E. 6.)

(iii) Respondent recorded or caused to be recorded the mortgage on August 17, 1987, at mortgage book volume 168, page 60, in [   ] County. (P.E. 137, 11(a)(iii); P.E. 59(a), P.D.E. 6.)

(b) The note, which accompanied the mortgage, reflected that the [C] were to pay a rate of 11. percent per year on the "borrowed" $30,000. (P.E. 137, 11(b); P.E. 59(a), P.D.E. 7.)

(i) Total payment by the [C] to [J] would be in the amount of $30,550. (P.E. 137, 11(b)(i); P.E. 59(a), P.D.E. 7.)

(ii) Upon respondent's prompting and advice, the note was executed by the [C]. (P.E. 137, 11(b)(ii).)

(12) At the time the [C] executed the mortgage and the note, they did not understand the reason for the execution of the documents by them concerning their property. (P.E. 137, 12.)

(a) Respondent advised the [C] that he would be responsible for the repayment to [J]. (P.E. 137, 12(a).)

(b) Respondent advised the [C] that "if you can't trust your lawyer, who can you trust," or words to similar effect. (P.E. 137, 12(b).)

(c) Respondent's testimony at the disciplinary hearing that he did not tell the [C] that he would repay [J] was false. (P.E. 137, 12(a); N.T. 321-322.)

(13) The [C] deposited the entire $30,000 into a Pennsylvania bank account under their control. (P.E. 137, 13.)

(a) The [C] then contacted [J] regarding the $30,000. (P.E. 137, 13(a).)

(b) [J] advised the [C] that, pursuant to respondent's advice, she had "loaned" the money to the [C] and if they failed to repay her, she would "own a $70,000 home in [   ]." (P.E. 137, 13(b); P.E. 135.)

(c) By October 31, 1987, the [C] paid to [J] the $30,000 they had received from respondent. (P.E. 137, 13(c); P.E. 59(a), P.D.E. 13.)

(d) When the [C] later learned of the recorded mortgage, they took the appropriate steps to satisfy the mortgage. (P.E. 137, 13(d); P.E. 59(a), P.D.E. 6.)

(14) Respondent meanwhile had begun negotiations with the [B] Real Estate Agency for a listing contract on the [C] property. (P.E. 137, 14.)

(15) By an undated letter received by the [B] Agency on June 8, 1987, respondent made a proposal to the [B] Agency with regard to the [C] property. (P.E. 137, 15; P.E. 63.)

(a) Included in respondent's proposal was that a lot containing the [C] house be sold by the [B] Agency for between $55,000 and $62,000 and that the adjacent lot be sold for between $9,500 and $10,500. (P.E. 137, 15(a); P.E. 63.)

(b) Respondent advised that he was "handling this property on behalf of clients." (P.E. 137, 15(b); P.E. 63.)

(16) Thereafter, respondent entered into two listing contracts with the [B] Agency on July 23, 1987, with regard to the [C] property. (P.E. 137, 16; P.E. 64; P.E. 65.)

(a) The listing contracts reflected the owners as the [C] and respondent as having power of attorney. (P.E. 137, 16(a); P.E. 64; P.E. 65.)

(i) Said representation was false in that respondent did not then or thereafter receive a power of attorney from the [C]. (P.E. 137, 16(a)(i).)

(ii) At the time respondent signed the listing contract, he knew that he did not have a power of attorney. (P.E. 137, 16(a)(ii).)

(b) The listing price for the property on which the house was located was $65,000 and the listing price for the adjacent lot was $10,500. (P.E. 137, 16(b); P.E. 64; P.E. 65.)

(c) The listing contracts were to be in effect for a period of three months. (P.E. 137, 16(c); P.E. 64; P.E. 65.)

(17) The [B] Agency was unsuccessful in its attempt to sell the [C] property and by a "notice of change in listing agreement," respondent agreed to reduce the listing price on the property regarding the house from $65,000 to $59,500. (P.E. 137, 17; P.E. 66(a); P.E. 66(b).)

(a) The notice was dated September 18, 1987. (P.E. 137, 17(a); P.E. 66(a); P.E. 66(b).)

(b) Respondent again represented thereon that he had power of attorney for the [C], by signing his name as the "owner" above typewritten words "with power of attorney for [ ] and [ ] [C], *et ux.*" (P.E. 137, 17(b); P.E. 66(a); P.E. 66(b).)

(i) Said representation was false, in that respondent did not then or thereafter receive a power of attorney from the [C]. (P.E. 137, 17(b)(i).)

(ii) At the time respondent signed the notice, he knew that he did not have a power of attorney. (P.E. 137, 17(b)(ii).)

(18) Thereafter, an offer of $45,000 was made to purchase the [C] property, which offer was conveyed by [K] of the [B] Agency, both to respondent and to the [C] by letter dated September 25, 1987. (P.E. 137, 18; P.E. 59(a), P.D.E. 8.)

(a) The [C] then contacted [B], owner of the [B] Agency, questioning him regarding his involvement with their property. (P.E. 137, 18(a).)

(b) [B] advised the [C] of his involvement with respondent, allegedly on the [C's] behalf. (P.E. 137, 18(b).)

(c) The [C] then advised [B] that they had never given respondent a power of attorney. (P.E. 137, 18(c).)

(19) On September 25, 1987, during a telephone conversation between respondent and [B], respondent advised [B] that: (P.E. 137, 19.)

(a) Respondent did not have power of attorney from the [C] to act on their behalf in regard to the property; and, (P.E. 137, 19(a).)

(b) Respondent was acting as owner of the property on behalf of "investors." (P.E. 137, 19(b).)

(20) Thereafter, by letter dated September 30, 1987, respondent wrote to the [B]Agency confirming the September 25 conversation. (P.E. 137, 20; P.E. 67.) Therein, respondent:

(a) Stated "[i]t makes no sense to me economically to sell the propeerty [sic] for any less than $55,000;" (P.E. 137, 20(a); P.E. 67.)

(b) Further stated that he was rescinding the listing contract with the [B] Agency because of their "inability to sell the property" at a price acceptable to respondent; and, (P.E. 137, 20(b); P.E. 67.)

(c) Advised that "[e]ven at $55,000 I would have to renegotiate the terms of the listing agreement such as commission rates, etc. because of the costs involved to me and other people who have invested money into that property." (P.E. 137, 20(c); P.E. 67.)

(21) By certified letter dated November 1, 1987, [B] wrote to respondent regarding the September 30 letter. That letter reiterated some of the telephone conversation between respondent and [B] on September 25. (P.E. 137, 21; P.E. 68.) Therein, [B]:

494

(a) Reminded respondent that the "listing contract with [ ] and [ ] [C] for sale of their property on [ ] Road has you as power of attorney;" (P.E. 137, 21(a); P.E. 68.)

(b) Reminded respondent that "[i]n our telephone conversation on Friday September 25, 1987 you contradicted the listing contract and stated that you did not have power of attorney, but were acting as owner of the property on behalf of investors;" and, (P.E. 137, 21(b); P.E. 68.)

(c) Requested that respondent forward to him *"... immediately the supporting documentation that shows you have either power of attorney or the legal capacity to act as OWNER."* (emphasis in original) (P.E. 137, 21(c); P.E. 68.)

(22) By letter dated November 10, 1987, respondent wrote to [B]. (P.E. 137, 22; P.E. 69.) Therein, he stated that:

(a) He had "... not in any way breached any provisions of your listing contract either in letter or the spirit of the terms. When your associate accepted my signature on the listing contract and in effect accepted my authority to list the property with you. If you had any concerns at the time it was up to you or your associate to verify my authority to list it with you;" and, (P.E. 137, 22(a); P.E. 69.)

(b) With regard to the offer on the house, respondent "discussed that offer with the [C] and they have authorized me to reject that offer to the extent that their rejection was necessary." (P.E. 137, 22(b); P.E. 69.)

(i) This statement was false in that respondent never discussed the offer with the [C]. (P.E. 137, 22(b)(i).)

(ii) At the time respondent made the statement, he knew it to be false. (P.E. 137, 22(b)(ii).)

(23) Respondent did not forward to [B] any documentation which would support his representations that he had a power of attorney from the [C] or had any authority to act on their behalf, as owners of the property. (P.E. 137, 23.)

(24) By letter to respondent dated January 2, 1988, the [C] requested that respondent send to them "the original copy" of any power of attorney they had given to respondent. (P.E. 137, 24; P.E. 59(a), P.D.E. 14.)

(25) Thereafter, respondent failed to respond to the [C] or to supply them with the requested documentation. (P.E. 137, 25.)

(26) Since the August 14, 1987 sales agreement with the [C] had been recorded, the [C] retained counsel and, on about August 8, 1988, a cancellation agreement was filed. (P.E. 137, 26; P.E. 59(a), P.D.E. 16.)

(27) Respondent represented to petitioner in a January 25, 1989 letter, that [L] and [M] were going to be partners with respondent in purchasing the [C] property in [   ], Pa. (P.E. 137, 27.)

(a) At the time respondent made the statement, it was false and respondent knew it to be false. (P.E. 137, 27(a).)

(b) That statement was false in that: (P.E. 137, 27(b).)

(i) Neither [L] nor [M] ever expressed an interest in investing in the [C] property or any property in [   ], Pa., and, (P.E. 137, 27(b)(i); P.E. 62.)

(ii) Respondent never discussed with either man the purchase of the [C] property or any property in [   ], Pa. (P.E. 137, 27(b)(ii); P.E. 62.)

(28) With regard to the civil action concerning their son in which respondent represented the [C], respondent represented to petitioner in a February 7, 1989 letter that "I also had something at stake there, because I

had a contingency fee agreement with them. If we had to settle for a small amount because of their financial predicament, my share of the fee would also be small." (P.E. 137, 28.)

## Charge II ([J])

(29) The source of the $30,000 which respondent had given to the [C] on August 14, 1987, was settlement proceeds received by respondent on behalf of his client, [J]. (P.E. 137, 31.)

(a) [J] had retained respondent and agreed to a 25 percent contingent fee arrangement. (P.E. 137, 31(a).)

(b) Respondent thereafter negotiated a settlement on behalf of [J] in the amount of $50,000 as to [N], of which $37,500 was due [J], and in the amount of $15,000 as to [J's] insurance company, of which $11,250 was due [J]. (P.E. 137, 31(b).)

(30) [N] then issued a draft in the amount of $50,000, which respondent and [J] endorsed. (P.E. 137, 32.)

(31) Respondent advised [J] that there were unnamed people who needed to borrow money for three months and that they would pay her 11 percent interest. (P.E. 137, 33; P.E. 135.)

(a) Respondent advised [J] that if she put the money in the bank, she would earn less interest than if she lent the money. (P.E. 137, 33(a); P.E. 135.)

(b) Respondent further indicated that the people to whom she would lend the money would use their home as collateral, and that if she failed to receive her money at the end of the three month period, approximately October 31, 1987, [J] would get their home. (P.E. 137, 33(b).)

(c) [J] agreed to lend $30,000 to the unidentified people for a period of three months. (P.E. 137, 33(c).)

(32) On August 7, 1987, respondent caused [J's] share of the $50,000 to be placed into an account which he had opened on her behalf at the Federal Credit Union. (P.E. 137, 34; P.E. 70(a)-70(f).)

(a) This deposit was in the amount of $37,500. (P.E. 137, 34(a); P.E. 70(a).)

(b) The account into which the funds were deposited was no. [    ], 118 [J] account. (P.E. 137, 34(b); P.E. 70(a).)

(c) The account was opened in respondent's name alone and captioned "[respondent]." (P.E. 137, 34(c); P.E. 70(a)-70(f).)

(d) The account was not designated in any way as an "escrow" or "fiduciary" account. (P.E. 137, 34(d); P.E. 70(a)-70(f).)

(e) Respondent had sole authority and direction over the funds in this account. (P.E. 137, 34(e); P.E. 70(a)-70(f); N.T. 70, 89, 108.)

(33) Respondent was thereafter entrusted to maintain the $37,500 on behalf of [J] unless and until disbursements were made to [J] or on her behalf. (P.E. 137, 35.)

(34) Since [J] had agreed to loan $30,000 of her $37,500, respondent drew a check on his 079 personal account in the amount of $30,000, payable to the [C]. (P.E. 137, 36; P.E. 59(a), P.D.E. 5.)

(a) When this check was presented for payment on August 19, 1987, at the Federal Credit Union, the balance in respondent's 079 personal account was $773.32. (P.E. 137, 36(a); P.E. 71(e), pg. 3.)

(b) In order to enable the check to the [C] to clear, a transfer in the amount of $29,226.68 was made from the 118 [J] account to the 079 personal account. (P.E. 137, 36(b); P.E. 74; P.E. 70(a); P.E. 71(e), pg. 3.)

498

(35) Thus, as of August 19, 1987, respondent's entrustment as to [J] was reduced to $7,500. (P.E. 137, 37.)

(36) On August 20, 1987, respondent deposited into the 118 [J] account the second settlement check in the amount of $15,000, received on behalf of [J]. (P.E. 137, 38; P.E. 70(a).)

(a) [J's] share of the $15,000 was $11,250. (P.E. 137, 38(a).)

(b) Thus, as of August 20, 1987, respondent's entrustment as to [J] increased to $18,750 ($7,500 + $11,250). (P.E. 137, 38(b).)

(37) Respondent was entrusted with $18,750 on behalf of [J] until those funds were paid out by him to or on behalf of [J]. (P.E. 137, 39.)

(38) On September 2, 1987, check no. 586, drawn on the 079 personal account, in the amount of $1,000, and payable to [J], cleared the 079 personal account and reduced respondent's entrustment to $17,750. (P.E. 137, 40.)

(39) Beginning on September 11, 1987, and continuing through January 20, 1988, when [J] received the last of her funds from respondent, the 118 [J] account was continuously below the entrusted amount. (P.E. 137, 41; P.E. 70(a)-70(f); P.E. 81(a).)

(a) During this time period, the funds in the 118 [J] account were transferred to respondent's 079 personal account. (P.E. 137, 41(a); P.E. 70(a); P.E. 71(f); P.E. 74; P.E. 75; P.E. 76; P.E. 77(a) and (b); P.E. 78; P.E. 79; P.E. 80; P.E. 81(a); P.E. 81(b).)

(b) Between September 11 and September 24, 1987, respondent made no disbursements to or on behalf of [J] from the 118 [J] account or the 079 personal account.

(P.E. 137, 41(b); P.E. 70(a); P.E. 71(f); P.E. 72(a)-(hh); P.E. 81(a); P.E. 81(b).)

(40) Between September 11 and September 24, 1987, 34 checks unrelated to the [J] matter cleared respondent's 079 personal account. (P.E. 137, 42; P.E. 81(b).) Those checks were:

(a) Check no. 612, in the amount of $2.50, dated August 31, 1987, payable to "[O] Hardware;" (P.E. 137, 42(a); P.E. 72(a); P.E. 81(b).)

(b) Check no. 640, in the amount of $30, dated September 10, 1987, payable to "cash;" (P.E. 137, 42(b); P.E. 72(b); P.E. 81(b).)

(c) Check no. 629, in the amount of $60, dated September 3, 1987, payable to "[    ];" (P.E. 137, 42(c); P.E. 72(c); P.E. 81(b).)

(d) Check no. 627, in the amount of $84, dated September 3, 1987, payable to "[P] Auto Parts;" (P.E. 137, 42(d); P.E. 72(d); P.E. 81(b).)

(e) Check no. 601, in the amount of $1,300, dated August 28, 1987, payable to "[Q];" (P.E. 137, 42(e); P.E. 72(e); P.E. 81(b).)

(f) Check no. 635, in the amount of $16, dated September 9, 1987, payable to "[R] Industries;" (P.E. 137, 42(f); P.E. 72(f); P.E. 81(b).)

(g) Check no. 642, in the amount of $30, dated September 11, 1987, payable to "cash;" (P.E. 137, 42(g); P.E. 72(g); P.E. 81(b).)

(h) Check no. 583, in the amount of $95, dated August 25, 1987, payable to "[    ] Chamber of Commerce;" (P.E. 137, 42(h); P.E. 72(h); P.E. 81(b).)

(i) Check no. 641, in the amount of $150, dated September 10, 1987, payable to "[S];" (P.E. 137, 42(i); P.E. 72(i); P.E. 81(b).)

(j) Check no. 602, in the amount of $301.32, dated August 29, 1987, payable to "[T];" (P.E. 137, 42(j); P.E. 72(j); P.E. 81(b).)

(k) Check no. 645, in the amount of $339.59, dated September 11, 1987, payable to "[H];" (P.E. 137, 42(k); P.E. 72(k); P.E. 81(b).)

(1) Check no. 619, in the amount of $1,152.18, dated August 30, 1987, payable to "[U];" (P.E. 137, 42(l); P.E. 72(l); P.E. 81(b).)

(m) Check no. 638, in the amount of $30.50, dated September 9, 1987, payable to "Prothonotary [    ] County;" (P.E. 137, 42(m); P.E. 72(m); P.E. 81(b).)

(n) Check no. 647, in the amount of $50, dated September 12, 1987, payable to "[V];" (P.E. 137, 42(n); P.E. 72(n); P.E. 81(b).)

(o) Check no. 644, in the amount of $53.80, dated September 11, 1987, payable to "United Parcel Service;" (P.E. 137, 42(o); P.E. 72(o); P.E. 81(b).)

(p) Check no. 646, in the amount of $55.34, dated September 14, 1987, payable to "[W];" (P.E. 137, 42(p); P.E. 72(p); P.E. 81(b).)

(q) Check no. 648, in the amount of $100, dated August 12, 1987, payable to "[X];" (P.E. 137, 42(q); P.E. 72(q); P.E. 81(b).)

(r) Check no. 649, in the amount of $250, dated September 14, 1987, payable to "[V];" (P.E. 137, 42(r); P.E. 72(r); P.E. 81(b).)

(s) Check no. 580, in the amount of $4,268.25, dated August 14, 1987, payable to "[Y];" (P.E. 137, 42(s); P.E. 72(s); P.E. 81(b).)

(t) Check no. 636, in the amount of $23.97, dated September 9, 1987, payable to "[Z] Publishers;" (P.E. 137, 42(t); P.E. 72(t); P.E. 81(b).)

(u) Check no. 639, in the amount of $41.50, dated September 9, 1987, payable to "[AA];" (P.E. 137, 42(u); P.E. 72(u); P.E. 81(b).)

(v) Check no. 625, in the amount of $134.76, dated September 2, 1987, payable to "[BB] Reporting Service;" (P.E. 137, 42(v); P.E. 72(v); P.E. 81(b).)

(w) Check no. 643, in the amount of $282, dated September 11, 1987, payable to "[CC] Federal;" (P.E. 137, 42(w); P.E. 72(w); P.E. 81(b).)

(x) Check no. 517, in the amount of $11.50, dated July 31, 1987, payable to "County of [    ], Elections Office;" (P.E. 137, 42(x); P.E. 72(x); P.E. 81(b).)

(y) Check no. 553, in the amount of $25, dated August 10, 1987, payable to "[DD];" (P.E. 137, 42(y); P.E. 72(y); P.E. 81(b).)

(z) Check no. 654, in the amount of $60, dated September 16, 1987 payable to "[EE];" (P.E. 137, 42(z); P.E. 72(z); P.E. 81(b).)

(aa) Check no. 650, in the amount of $241.24, dated September 16, 1987, payable to "[FF] Payment Services;" (P.E. 137, 42(aa); P.E. 72(aa); P.E. 81(b).)

(bb) Check no. 652, in the amount of $700, dated September 16, 1987, payable to "[GG];" (PE 137, 42(bb); P.E. 72(bb); P.E. 81(b).)

(cc) Check no. 653, in the amount of $800, dated September 16, 1987, payable to "[HH];" (P.E. 137, 42(cc); P.E. 72(cc); P.E. 81(b).)

(dd) Check no. 657, in the amount of $12, dated September 18, 1987, payable to "[II];" (P.E. 137, 42(dd); P.E. 72(dd); P.E. 81(b).)

(ee) Check no. 660, in the amount of $50, dated September 19, 1987, payable to "[II];" (P.E. 137, 42(ee); P.E. 72(ee); P.E. 81(b).)

502

(ff) Check no. 659, in the amount of $100, dated September 2, 1987, payable to "[JJ];" (P.E. 137, 42(ff); P.E. 72(ff); P.E. 81(b).)

(gg) Check no. 633, in the amount of $265.99, dated September 3, 1987, payable to "[KK];" and, (P.E. 137, 42(gg); P.E. 72(gg); P.E. 81(b).)

(hh) Check no. 8000, [sic] (a deduction) in the amount of $600, dated September 20, 1987, payable to "[LL] Publishing;" (P.E. 137, 42(hh); P.E. 72(hh); P.E. 81(b).)

(41) By September 24, 1987, the balance in the 118 [J] account had been reduced to $101.33. (P.E. 137, 43; P.E. 70(a); P.E. 81(a).)

(42) Respondent made the following disbursements to [J] after the 118 [J] account balance had been reduced to about $100: (P.E. 137, 44.)

(a) $500 by check no. 2164, dated September 29, 1987, drawn on respondent's [MM] Bank and trust attorney at law account no. [    ]; (P.E. 137, 44(a).)

(b) $15,000 by cashier's check, dated October 1, 1987, and purchased with proceeds from the 079 personal account; and, (P.E. 137, 44(b).)

(c) $2,616 by check no. 953, dated January 14, 1988 drawn on and clearing the 079 personal account on January 20, 1988. (P.E. 137, 44(c).)

(43) These disbursements reduced respondent's entrustment to $0 on behalf of [J]. (P.E. 137, 45.)

(44) Respondent misappropriated the funds entrusted to him on behalf of [J]. (P.E. 70(a)-70(f); P.E. 71(e) and (f); P.E. 72(a)-(hh); P.E. 81(a); P.E. 81(b).)

(45) Respondent commingled these entrusted funds with personal funds. (P.E. 137, 47; P.E. 71(e) and (f); P.E.s 74-80.)

(46) At the investigatory hearing held on June 29, 1989, respondent was asked the following question by

his attorney, [NN]: "[d]id you know that, did you at any time know that at the time the debits were being made against the account held for [J], did you know that those were being made?" (P.E. 137, 48.)

(a) Respondent's answer to that question was: "No, absolutely not." (P.E. 137, 48(a).)

(b) That representation was false in that: (N.T. 72-74, 75-87, 89-90, 99-102, 104.)

(i) Respondent made or caused to be made all but one transfer of funds from the 118 [J] account to the 079 personal account; and, (P.E. 137, 48(b)(i); P.E.s 74-76; P.E.s 78-80; N.T. 72-74, 75-87, 89-90, 99-102, 104.)

(ii) One such transfer was made by the Federal Credit Union on September 17, 1987, of which respondent was given notice. (P.E. 137, 48(b)(ii); P.E. 77(a) and (b); N.T. 83-86.)

(47) On or about November 13, 1987, respondent personally borrowed from [J] $20,000 of the $30,000 returned to her by the [C]. (P.E. 137, 49.)

(48) In respondent's May 16, 1988 answer to petitioner's April 28, 1988 letter, respondent represented that the $15,000 check which he received on behalf of [J] was "... deposited in the [J] account and disbursments [sic] made *at her direction....* Thus, at no time did I comingle [sic] [J's] fund with mine except when, *at her direction,* I made disbursements on her behalf, until she opened her own checking account." (emphasis supplied) (P.E. 137, 50.)

(a) At the time respondent made that statement, it was false and respondent knew it to be false. (P.E. 137, 41, 50(c); P.E.s 70(a)-(f); P.E. 81(a).)

(b) That statement was false in that respondent had made no disbursements on [J's] *behalf,* and respondent

had only disbursed $1,000 to her prior to depleting the funds in the 118 [J] account. (P.E. 137, 40, 41(a); P.E.s 74-80; P.E. 81(a); P.E. 81(b); P.E. 72(a)-(hh).)

(c) [J's] funds were used by respondent on his own behalf and on behalf of other clients. (P.E. 137, 50(c); P.E. 72 (a)-(hh); P.E. 81(a); P.E. 81(b); P.E. 70(a); P.E. 71(e) and (f).)

(49) In respondent's January 25, 1989 answer to petitioner's letter of October 29, 1988, respondent stated that "[b]ecause of the outstanding bills that had yet to be paid on behalf of [J], I decided to wait until all that was taken care of before I withdrew my share of the fees from the $15,000. When I had the last $10,000 transferred from that account, I was under the impression that there would be a minimal balance left, just enough to keep the account open. I had already disbursed [J's] share of the settlement proceeds from that account and what remained was money belonging to me." (P.E. 137, 51.)

(a) At the time respondent made those statements, they were false and respondent knew them to be false. (P.E. 70(a); P.E. 137, 40, 44, 44(a), 44(b), 44(c).)

(b) Those statements were false in that:

(i) There were no outstanding bills which respondent was to pay on behalf of [J]; (P.E. 135.)

(ii) Respondent had withdrawn his fee from the $15,000 by September 9, 1987; (P.E. 70(a); P.E. 81(b); N.T. 118.)

(iii) Respondent had not "already disbursed [J's] share" of the settlement proceeds to [J] by that time; and, (P.E. 137, 40, 44, 44(a), 44(b), 44(c).)

(iv) The "minimal" remaining balance were funds entrusted to respondent and not "money belonging to" respondent. (P.E. 70(a); P.E. 81(b); N.T. 118.)

*Charge III ([OO]/[PP])*

(50) On August 13, 1987, respondent deposited into his [MM] attorney at law account a check in the amount of $4,829.50 from [   ] and [   ] [OO]. This check represented funds entrusted to respondent as a result of a real estate transfer between the [OO] and [Y]. (P.E. 137, 54; P.E. 82(a); P.E. 82(b); P.E. 82(c).)

(51) Respondent's [MM] attorney at law account was not a denominated segregated account for client funds. (P.E. 137, 55.)

(52) Respondent deposited personal funds into the [MM] attorney at law account. (P.E. 137, 56.)

(a) On August 10, 1987, respondent deposited $520 into his [MM] attorney at law account consisting of $20 from [   ] and [   ] [QQ] annotated "August rent" and $500 from [RR] annotated "legal expenses." (P.E. 137, 56(a).)

(b) On August 14, 1987, respondent deposited $568 into his [MM] attorney at law account consisting of $560 from [SS] Bus Lines, Inc., annotated "att. fee for loan" and $8 from the law firm of [TT]. (P.E. 137, 56(b).)

(53) At an investigatory hearing on June 29, 1989, respondent testified that it was his general practice to deposit funds that he received as a result of a real estate closing into his [MM] attorney at law account and then transfer those funds to his 079 personal account at the Federal Credit Union and make disbursements therefrom. (P.E. 137, 57.)

(54) On August 13, 1987, by [MM] attorney at law account check no. 2142 in the amount of $5,000, respondent transferred, the [OO] funds to his 079 personal account. (P.E. 137, 58; P.E. 71(e), pg. 2; P.E. 83.)

(55) Respondent's 079 personal account was not a denominated segregated account for client funds. (P.E. 137, 59.)

(56) After deduction of fees and costs, as of August 13, 1987 respondent was entrusted with at least $4,268.25 on behalf of the [OO], and was to maintain those funds until he paid them out on behalf of the [OO]. (P.E. 137, 60.)

(57) Thereafter, the 079 personal account balance was continuously below the entrusted amount of $4,268.25. (P.E. 137, 61; P.E. 71(e) and (f); P.E. 88.)

(58) Between August 13, 1987 and August 20, 1987, [23] 20 checks unrelated to the [OO] matter cleared respondent's 079 personal account. Those checks were: (P.E. 137, 62; P.E. 85(a)-(t).)

(a) Check no. 549, in the amount of $13, dated August 10, 1987, payable to "United Parcel Service;" (P.E. 137, 62(a); P.E. 85(a).)

(b) Check no. 554, in the amount of $54.67, dated August 10, 1987, payable to "[H];" (P.E. 137, 62(b); P.E. 85(b).)

(c) Check no. 524, in the amount of $100, dated August 7, 1987, payable to "[UU];" (P.E. 137, 62(c); P.E. 85(c).)

(d) Check no. 532, in the amount of $135, dated August 6, 1987, payable to "[VV];" (P.E. 137, 62(d); P.E. 85(d).)

(e) Check no. 535, in the amount of $195.70, dated August 6, 1987, payable to "Bureau of National Affairs;" (P.E. 137, 62(f); P.E. 85(e).)

(f) Check no. 567, in the amount of $3,056.71, dated August 12, 1987, payable to "[WW];" (P.E. 137, 62(g); P.E. 85(f).)

(g) Check no. 576, in the amount of $10, dated August 14, 1987, payable to "cash;" (P.E. 137, 62(h); P.E. 85(g).)

(h) Check no. 552, in the amount of $45, dated August 10, 1987, payable to "[XX];" (P.E. 137, 62(i); P.E. 85(h).)

(i) Check no. 564, in the amount of $70.55, dated August 12, 1987, payable to "[YY];" (P.E. 137, 62(j); P.E. 85(i).)

(j) Check no. 568, in the amount of $75, dated August 13, 1987, payable to "[X];" (P.E. 137, 62(k); P.E. 85(j).)

(k) Check no. 566, in the amount of $1.15, dated August 12, 1987, payable to "[FF];" (P.E. 137, 62(l); P.E. 85(k).)

(1) Check no. 577, in the amount of $10, dated August 14, 1987, payable to "cash;" (P.E. 137, 62(m); P.E. 85(l).)

(m) Check no. 565, in the amount of $41.22, dated August 12, 1987, payable to "[ZZ];" (P.E. 137, 62(n); P.E. 85(m).)

(n) Check no. 562, in the amount of $200, dated August 12, 1987, payable to "[AAA];" (P.E. 137, 62(q); P.E. 85(n).)

(o) Check no. 581, in the amount of $311.60, dated August 14, 1987, payable to "[H];" (P.E. 137, 62(r); P.E. 85(o).)

(p) Check no. 563, in the amount of $586.64, dated August 12, 1987, payable to "[W] Pennsylvania;" (P.E. 137, 62(s); P.E. 85(p).)

(q) Check no. 571, in the amount of $27, dated August 12, 1987, payable to "[BBB];" (P.E. 137, 62(u); P.E. 85(q).)

(r) Check no. 556, in the amount of $51, dated August 11, 1987, payable to "[CCC] Publishing Company;" (P.E. 137, 62(v); P.E. 85(r).)

(s) Check no. 575, in the amount of $55.02, dated August 13, 1987, payable to "[DDD] Office Products;" and, (P.E. 137, 62(w); P.E. 85(s).)

(t) Check no. 539, in the amount of $3,500, dated August 6, 1987, payable to "[EEE];" (P.E. 137, 62(x); P.E. 85(t).)

(59) On August 20, 1987, the 079 personal account balance was reduced to $0. (P.E. 137, 63; P.E. 71(e), pg. 3.)

(60) Respondent thus misappropriated the entire [OO] entrustment. (P.E. 137, 61; P.E. 71(e); P.E. 88; P.E. 85(a)-(t).)

(61) On August 31, 1987, respondent deposited into his [MM] attorney at law account a check in the amount of $1,443.50 from [    ] and [    ] [PP]. (P.E. 137, 65; P.E. 82(a); P.E. 82(d); P.E. 82(e).)

(62) That check represented funds entrusted to respondent as a result of the real estate transfer between the [PP] and [Q]. (P.E. 137, 66.)

(63) In accordance with respondent's general practice, on September 2, 1987, by [MM] attorney at law account check no. 2156 in the amount of $2,500, respondent transferred the [PP] funds to his 079 personal account. (P.E. 137, 67; P.E. 86.)

(64) After deduction of fees and costs, as of September 2, 1987, respondent was entrusted to maintain $1,300 on behalf of the [PP] until he paid out those funds, and $4,268.25 on behalf of the [OO]. (P.E. 137, 68.)

(65) On September 2, 1987, respondent's total entrustment was $5,568.25 ($1,300 + $4,268.25). (P.E. 137, 69.)

(66) Thereafter, until respondent disbursed the entrusted funds, the 079 personal account balance was

continuously below the entrusted amount of $5,568.25. (P.E. 137, 70; P.E. 71(f); P.E. 88.)

(67) Between September 2, 1987 and September 10, 1987, [37] 34 checks unrelated to the [OO] or [PP] matters cleared respondent's 079 personal account. (P.E. 137, 71; P.E. 87(a)-(hh).) Those checks were:

(a) Check no. 586, in the amount of $1,000, dated August 27, 1987, payable to "[J];" (P.E. 137, 71(a); P.E. 87(a).)

(b) Check no. 608, in the amount of $16, dated August 28, 1987, payable to "[FFF];" (P.E. 137, 71(e); P.E. 87(b).)

(c) Check no. 585, in the amount of $40.28, dated August 26, 1987, payable to "[GGG] Auto Repair;" (P.E. 137, 71(f); P.E. 87(c).)

(d) Check no. 610, in the amount of $81.61, dated August 28, 1987, payable to "[HHH] Fuel;" (P.E. 137, 71(g); P.E. 87(d).)

(e) Check no. 604, in the amount of $154.17, dated August 28, 1987, payable to "District Court—59-302;" (P.E. 137, 71(h); P.E. 87(e).)

(f) Check no. 587, in the amount of $214.70, dated August 26, 1987, payable to "[W] Pennsylvania;" (P.E. 137, 71(i); P.E. 87(f).)

(g) Check no. 611, in the amount of $330.05, dated August 28, 1987, payable to "[H];" (P.E. 137, 71(j); P.E. 87(g).)

(h) Check no. 593, in the amount of $50, dated August 26, 1987, payable to "[III], Attorneys at Law;" (P.E. 137, 71(k); P.E. 87(h).)

(i) Check no. 617, in the amount of $50, dated August 31, 1987, payable to "[JJJ];" (P.E. 137, 71(l); P.E. 87(i).)

510

(j) Check no. 597, in the amount of $86.08, dated August 27, 1987, payable to "[KKK] Bank;" (P.E. 137, 71(m); P.E. 87(j).)

(k) Check no. 595, in the amount of $88.25, dated August 26, 1987, payable to "[LLL];" (P.E. 137, 71(n); P.E. 87(k).)

(l) Check no. 592, in the amount of $100, dated August 26, 1987, payable to "[HHH] Fuel;" (P.E. 137, 71(o); P.E. 87(l).)

(m) Check no. 615, in the amount of $100, dated August 31, 1987, payable to "the postmaster;" (P.E. 137, 71(p); P.E. 87(m).)

(n) Check no. 531, in the amount of $198.21, dated August 5, 1987, payable to "[KKK] Bank;" (P.E. 137, 71(q); P.E. 87(n).)

(o) Check no. 598, in the amount of $205.71, dated August 27, 1987, payable to "[KKK] Bank;" (P.E. 137, 71(r); P.E. 87(o).)

(p) Check no. 588, in the amount of $15, dated August 26, 1987, payable to "Dr. [MMM];" (P.E. 137, 71(s); P.E. 87(p).)

(q) Check no. 632, in the amount of $30, dated September 3, 1987, payable to "cash;" (P.E. 137, 71(t); P.E. 87(q).)

(r) Check no. 628, in the amount of $50, dated September 3, 1987, payable to "[X];" (P.E. 137, 71(u); P.E. 87(r).)

(s) Check no. 614, in the amount of $101.75, dated August 31, 1987, payable to "[NNN];" (P.E. 137, 71(v); P.E. 87(s).)

(t) Check no. 613, in the amount of $6.46, dated August 31, 1987, payable to "[OOO] Book Club;" (P.E. 137, 71(w); P.E. 87(t).)

(u) Check no. 623, in the amount of $14, dated September 1, 1987, payable to "Federal Express;" (P.E. 137, 71(x); P.E. 87(u).)

(v) Check no. 547, in the amount of $20, dated August 7, 1987, payable to "[PPP];" (P.E. 137, 71(y); P.E. 87(v).)

(w) Check no. 634, in the amount of $25, dated September 5, 1987, payable to "cash;" (P.E. 137, 71(z); P.E. 87(w).)

(x) Check no. 600, in the amount of $100, dated August 28, 1987, payable to "[MM] Bank;" (P.E. 137, 71(aa); P.E. 87(x).)

(y) Check no. 622, in the amount of $100, dated September 1, 1987, payable to "[QQQ] Comapny [sic];" (P.E. 137, 71(bb); P.E. 87(y).)

(z) Check no. 630, in the amount of $109.72, dated September 3, 1987, payable to "[HHH] Fuel;" (P.E. 137, 71(cc); P.E. 87(z).)

(aa) Check no. 618, in the amount of $261.42, dated August 31, 1987, payable to "[RRR] Auto Repair;" (P.E. 137, 71(dd); P.E. 87(aa).)

(bb) Check no. 599, in the amount of $600, dated August 28, 1987, payable to "[MM] Bank;" (P.E. 137, 71(ee); P.E. 87(bb).)

(cc) Check no. 590, in the amount of $48, dated August 26, 1987, payable to "[SSS] Corporation;" (P.E. 137, 71(ff); P.E. 87(cc).)

(dd) Check no. 620, in the amount of $62.85, dated September 1, 1987, payable to "[TTT] Publishing;" (P.E. 137, 71(gg); P.E. 87(dd).)

(ee) Check no. 626, in the amount of $106.41, dated September 2, 1987, payable to "[YY];" (P.E. 137, 71(hh); P.E. 87(ee).)

(ff) Check no. 631, in the amount of $169.50, dated September 3, 1987, payable to "[W] Pennsylvania;" (P.E. 137, 71(ii); P.E. 87(ff).)

(gg) Check no. 616, in the amount of $234.47, dated September 1, 1987, payable to "[KK];" and, (P.E. 137, 71(jj); P.E. 87(gg).)

(hh) Check no. 609, in the amount of $300, date illegible, payable to "[HH]." (P.E. 137, 71(kk); P.E. 87(hh).)

(68) On September 10, 1987, the 079 personal account balance was $86.86. (P.E. 137, 72; P.E. 7(f), pg. 2; P.E. 88.)

(69) Respondent thus misappropriated $5,481.39 of the entrusted funds ($5,568.25 - $86.86). (P.E. 137, 73.)

(70) On September 11, 1987, check no. 601, drawn on respondent's 079 personal account, in the amount of $1,300, payable to [Q], was presented for payment at the Federal Credit Union. (P.E. 137, 74; P.E. 71(f), pg. 2; P.E. 72(e); P.E. 88.)

(71) Since the 079 personal account balance was $86.86, a transfer on September 11, 1987 into the 079 personal account in the amount of $2,000 was made. (P.E. 137, 75; P.E. 71(f), pg. 2; P.E. 76.)

(a) That transfer was from funds held in the 118 [J] account at the Federal Credit Union. (P.E. 137, 75(a); P.E. 70(a); P.E. 76; P.E. 81(a).)

(b) The [Q] check was enabled to clear upon presentation only by the transfer of entrusted [J] funds. (P.E. 137, 75(b); P.E. 71(f), pg. 2; P.E. 81(b).)

(72) On September 16, 1987, respondent's 079 personal account balance was only $982.63. (P.E. 137, 76; P.E. 71(f), pg. 2.)

(73) On September 17, 1987, check no. 580, drawn on respondent's 079 personal account in the amount of $4,268.25, payable to [Y], was presented for payment at the Federal Credit Union. (P.E. 137, 77; P.E. 71(f), pg. 3; P.E. 72(s); P.E. 88.)

(74) Since the 079 personal account balance was $982.63, a transfer into the 079 personal account in the amount of $3,285.62 was made. (P.E. 137, 78; P.E. 77(a).)

(a) That transfer was from funds held in the 118 [J] account at the Federal Credit Union. (P.E. 137, 78(a); P.E. 71(f), pg. 3; P.E. 77(a).)

(b) The check payable to [Y] was enabled to clear upon presentation only by the transfer of entrusted [J] funds. (P.E. 137, 78(b); P.E. 71(f), pg. 3; P.E. 81(b).)

### Charge IV ([UUU] Estate)

(75) On April 15, 1986, [VVV] died testate, while a resident of [   ] County, and owning only personal property. (P.E. 137, 80.)

(a) [VVV's] death was the result of an automobile accident. (P.E. 137, 80(a).)

(b) Suit was filed on behalf of the estate at no. 950 of 1987 in [   ] County. (P.E. 137, 80(b).)

(76) After provision for payment of her debts and funeral expenses, the will left the residue of [VVV's] estate to decedent's husband, [UUU]. (P.E. 137, 81.)

(77) At some point after April 15, 1986, [HH] retained respondent as attorney for the [VVV] estate. (P.E. 137, 82.)

(78) On May 22, 1986, [UUU] renounced his right to administer the estate, and letters testamentary were granted to the alternate executor, [HH], decedent's grandson. (P.E. 137, 83.)

(79) By letter dated March 18, 1987, the Department of Revenue notified [HH] that the [VVV] estate was "in a delinquent status" because the inheritance tax return had not been filed. (P.E. 137, 84.)

(80) Thereafter, respondent received $30,000 in settlement of the [VVV] estate civil suit. (P.E. 137, 85.)

(a) $15,000 was from [WWW's] Insurance and represented the policy limits on the driver of the vehicle in which [VVV] was killed. (P.E. 137, 85(a); P.E. 107.)

(b) $15,000 was from [XXX] Insurance and was a payout on [VVV's] underinsured motorist policy. (P.E. 137, 83(b); P.E. 108.)

(81) On December 14, 1987, a petition for citation was filed against [HH] for failure to file an inheritance tax return, and by order dated January 25, 1988, returnable March 18, 1988, [HH] was directed to show cause why the inheritance tax return for the [VVV] estate should not be filed. (P.E. 137, 86.)

(82) On or about March 14, 1988, respondent filed an inheritance tax return for the [VVV] estate. Additionally, respondent made an inheritance tax payment in the amount of $1,428.62. (P.E. 137, 87.)

(83) By notice dated August 1, 1988, respondent was advised by the Department of Revenue that the tax return which he filed had been changed, in that, since wrongful death claims were not taxable, the value of the [VVV] estate was reduced to $8,778.49 from $30,191.29. Thus, there was a credit balance in the amount of $1,422.89. (P.E. 137, 88.)

(84) On July 10, 1986, [UUU] died testate, while a resident of [    ] County and owning only personal property. (P.E. 137, 89.)

(85) After provisions for payment of taxes, the will directed the residue of the [UUU] estate to his two

grandchildren, [YYY] who was to receive 60 percent, and [HH], who was to receive 40 percent. (P.E. 137, 90; P.E. 89.)

(86) On July 14, 1986, letters testamentary were granted to respondent, at which time respondent was also acting as attorney for the [UUU] estate. (P.E. 137, 91.)

(87) On or about October 2, 1987, [ZZZ], attorney for [YYY], filed an inheritance tax return listing only schedule G transfers, and made an inheritance tax payment in the amount of $2,047.72. (P.E. 137, 92; P.E. 90.)

(88) On October 5, 1987, a petition to remove executor for non-performance of duties under the Probate, Estates and Fiduciaries Code of 1972, as amended, was filed by Attorney [ZZZ]. (P.E. 137, 93; P.E. 91(b).)

(89) Also on October 5, 1987, Judge [AAAA], issued an order to show cause why respondent should not be removed as executor of the [UUU] estate. Respondent was directed to appear before Judge [AAAA] on November 13, 1987. (P.E. 137, 94; P.E. 91(a).)

(90) On about November 12, 1987, respondent filed an answer to the petition to remove him as executor. (P.E. 137, 95; P.E. 92.)

(91) By order dated November 18, 1987, based upon stipulation of the parties, it was ordered that respondent would remain executor of the [UUU] estate (P.E. 137, 96; P.E. 93.) but that:

(a) Respondent was to file an inheritance tax return by November 27, 1987; (P.E. 137, 96(a); P.E. 93.)

(b) Within six weeks after notification by the Department of Revenue that the inheritance tax return had been accepted, the first and final account for the

[UUU] estate was to be filed by respondent; (P.E. 137, 96(b); P.E. 93.) and,

(c) Any and all penalties and interest that were a result of the late filing of the inheritance tax return were to be respondent's personal responsibility. (P.E. 137, 96(c); P.E. 93.)

(92) On or about November 27, 1987, respondent filed an inheritance tax return for the [UUU] estate. Additionally, respondent made an inheritance tax payment in the amount of $923.65, by check no. 822 drawn on his 079 personal account. (P.E. 137, 97; P.E. 94; P.E. 95.)

(93) On or about February 17, 1988, respondent filed an amended inheritance tax return, and made an additional inheritance tax payment in the amount of $327.24. (P.E. 137, 98; P.E. 96.)

(94) On about May 2, 1988, Attorney [ZZZ] filed another petition to remove executor for non-performance of duties under the Probate, Estates and Fiduciaries Code of 1972, as amended. (P.E. 137, 99; P.E. 97(b).)

(95) On May 2, 1988, Judge [AAAA] issued an order to show cause why respondent should not be removed as executor of the [UUU] estate. Respondent was ordered to appear before the court on June 3, 1988. (P.E. 137, 100; P.E. 97(a).)

(96) By order of court dated June 7, 1988, an evidentiary hearing with regard to the [UUU] estate was scheduled for August 2, 1988. (P.E. 137, 101.)

(97) On or about July 18, 1988, respondent filed a petition to compel turnover of estate assets against [YYY] and [HH]. (P.E. 137, 102.)

(a) On or about July 28, 1988, Attorney [ZZZ] filed an answer to petition to compel turnover of estate assets on behalf of [YYY]. (P.E. 137, 102(a).)

(b) Thereafter, on or about August 8, 1988 respondent filed a motion to amend petition. (P.E. 137, 102(b).)

(98) During the August 2, 1988 hearing before Judge [AAAA], the judge halted the proceedings and appointed an auditor to examine the estate accounts. (P.E. 137, 103.)

(99) By order of court dated August 18, 1988, the court appointed [BBBB], Esquire to act as auditor "... to review all of the activities of the executor pertaining to the exercising of his duties...." (P.E. 137, 104; P.E. 134(a), P.D.E. 17.)

(100) By another order of court dated August 18, 1988, Judge [AAAA] granted respondent's motion to amend petition, denied respondent's petition to compel turnover of estate assets and denied the rule to show cause. (P.E. 137, 105; P.E. 98.)

(101) By notice dated September 20, 1988, the auditor's hearing was scheduled for September 28, 1988. (P.E. 137, 106; P.E. 134(a), P.D.E. 18, P.D.E. 19.)

(a) The notice directed that if either party desired the services of a court reporter, $200 was to be deposited with the auditor prior to the hearing. (P.E. 137, 106(a); P.E. 134(a), P.D.E. 18.)

(b) Respondent did not request the services of a court reporter. (P.E. 137, 106(b).)

(102) By notice dated September 27, 1988, the auditor's hearing was rescheduled for October 14, 1988. (P.E. 137, 107; P.E. 134(a), P.D.E. 20.)

(103) A hearing before Attorney [BBBB], auditor, acting as "master" was held on October 14, 1988. (P.E. 137, 108.) At that hearing, respondent stated that:

(a) The $30,000 insurance settlement which respondent negotiated on behalf of the [VVV] estate was received by respondent on or about April 15, 1987. Ad-

ditionally, "... I guess when the check came as one lump sum, it was put into three different accounts. One was for $7,500 which was my fee that was charged to my overtime;" (P.E. 137, 108(a); P.E. 134(a), P.D.E. 21, pg. 13.)

(b) He "... took it [a $30,000 check] to [MM] Bank and had them issue three different, had them deposit it to different accounts. I guess it was made out to my name, the estate of and respondent, so I endorsed it, gave it to them and asked them to deposit it into three different accounts.... $6,700 went into the estate checking account and $7,500 went into my account;" (P.E. 137, 108 (b); P.E. 134(a), P.D.E. 21, pg. 14.)

(c) "I endorsed it [a $30,000 check] and asked them to deposit $15,779.25 into an interest bearing account." Attorney [BBBB] asked "[i]n whose name?" Respondent answered, "[t]hat was in [respondent]." (P.E. 137, 108(c); P.E. 134(a), P.D.E. 21, pg. 15.)

(d) Attorney [ZZZ] asked "$15,779.25 to respondent escrow account. What is that account for? What is the [respondent] account?" Respondent answered, "[w]ell that's for client's funds that stay there more than a day or two if I can upon this case, I get the interest statement right there and if its [sic] less than 30 days, I just divide it up by the number of days and I return it to that account....;" (P.E. 137, 108(d); P.E. 134(a), P.D.E. 21, pg. 15.)

(e) There was an estate account at [CCCC] Bank; (P.E. 137, 108(e); P.E. 134(a), P.D.E. 21, pg. 35.)

(f) The estate lent $5,000 to a client of respondent's, at respondent's suggestion. Respondent stated that "[t]hat was a loan that [HH] made to somebody at my suggestion and that was paid back with interest on 4/27 ... five days later;" (P.E. 137, 108(f); P.E. 134(a), P.D.E. 21, pg. 36.) and,

(g) "This was a personal loan made to a client of mine and I talked to [HH] about it." (P.E. 137, 108(g); P.E. 134(a), P.D.E. 21, pg. 38.)

(104) In fact:

(a) The $30,000 settlement was received by respondent in the form of two $15,000 checks (see para. 85 *supra*); (P.E. 137, 109(a); P.E. 107, P.E. 108) and,

(b) Those two $15,000 checks were deposited into respondent's 079 personal account. (P.E. 137, 109(b).)

(105) By notice dated November 28, 1988, respondent was advised of Attorney [BBBB's] intent to file his report on December 2, 1988. (P.E. 137, 110; P.E. 134(a), P.D.E. 22.)

(106) On or about December 2, 1988, Attorney [BBBB] filed the "report of [BBBB], auditor, acting as master." (P.E. 137, 111; P.E. 134(a), P.D.E. 23.) Therein, Attorney [BBBB] found that:

(a) "The executor has given no satisfactory explanation or excuse for failure to promptly settle a comparatively simple estate...;" (P.E. 137, 111(a); P.E. 134(a), P.D.E. 23, pg. 12.)

(b) "The inheritance tax returns prepared by the executor were imcomplete [sic] and incorrect...;" (P.E. 137, 111(b); P.E. 134(a), P.D.E. 23, pg. 13.)

(c) "The executor has failed to keep an accurate record of receipts and disbursements; and has failed to file an account despite an order by the court;" (P.E. 137, 111(c); P.E. 134(a), P.D.E. 23, pg. 13.)

(d) "The executor has improperly paid himself commissions and attorney's fees;" (P.E. 137, 111(d); P.E. 134(a), P.D.E. 23, pg. 13.)

(e) "The executor has co-mingled [sic] estate funds with his own funds and has made a loan to a third

party from estate funds;" (P.E. 137, 111(e); P.E. 134(a), P.D.E. 23, pg. 14) and,

(f) "The executor has breached his fiduciary duties by bestowing upon himself a payment priority in violation of 20 Pa.C.S. 3392, by charging the estate with expenses that were not legal and proper expenses of the estate, by negligently performing his duties, including the co-mingling [sic] of funds and by taking on obligations which impaired his judgment on behalf of the estate." (P.E. 137, 111(f); P.E. 134(a), P.D.E. 23, pg. 14.)

(107) Attorney [BBBB] recommended that the court "promptly make an order" removing respondent as executor and attorney for the estate. (P.E. 137, 112.)

(108) By order dated January 10, 1989, Judge [AAAA] denied the executor's objections to master's recommendation filed by respondent on January 10, 1989, as "... pursuant to executor's request, on January 3, 1989, for additional time within which to file objections to the master's recommendation which was filed December 2, 1988, and the court instructing the executor to file a motion requesting same along with a proposed order and granting an extension until January 6, 1989, the court finds that the executor did not file the necessary motion and order nor his objections by January 6, 1989...." (P.E. 137, 113; P.E. 99.)

(109) By order of court dated January 12, 1989, Judge [AAAA] approved Attorney [BBBB's] fees and costs "... and the personal representative of the estate of [UUU] IS ORDERED to make payment forthwith" in the amount of $1,140. (emphasis in original) (P.E. 137, 114; P.E. 100.)

(110) On or about March 8, 1989, through respondent's attorney, [RR], respondent filed a first and final

accounting and proposed distribution. (P.E. 137, 115; P.E. 101.)

(111) On March 29, 1989, objections to the account were filed by Attorney [ZZZ]. (P.E. 137, 116; P.E. 102.)

(112) Thereafter, through attorney [RR], respondent filed an amendment to the first and final account and proposed distribution. (P.E. 137, 117; P.E. 103.)

(113) On May 9, 1989, respondent made an additional inheritance tax payment in the amount of $1,405.78. (P.E. 137, 118.)

(114) By order of court dated June 21, 1989, Judge [AAAA] ordered that Attorney [BBBB's] fee in the amount of $1,140 "... is to be paid from the assets of said estate prior to any distribution...." (P.E. 137, 119; P.E. 104.)

(115) By order of court dated August 11, 1989, Judge [AAAA] "again approved" Attorney [BBBB's] fee in the amount of $1,140 and ordered that "[n]o monies shall be paid by way of distribution or for any other purpose unless and until the master/auditor is first paid the sum of $1,140." (P.E. 137, 120; P.E. 105.)

(116) In about October, 1989, a stipulation in settlement of objections filed and consent to court confirmation was agreed to between [YYY] and respondent and filed. (P.E. 137, 121; P.E. 106.)

(117) Respondent was not removed by the court as executor of the [UUU] estate. (P.E. 137, 122.)

(118) In December 1989, the master's fee was paid and the matter was settled between respondent and [YYY] by respondent's payment of $9,230.65 to [YYY]. (P.E. 137, 123.)

(119) An order of confirmation of account nisi dated December 4, 1989, was thereafter entered. (P.E. 137, 124.)

*Charge V ([UUU] Funds)*

(120) On April 10, 1987, respondent deposited a check in partial settlement of the [VVV] estate civil suit in the amount of $15,000 from [WWW] Insurance into his 079 personal account. (P.E. 137, 127; P.E. 107.)

(121) Thereafter, on April 13, 1987, respondent deposited another check in settlement of the [VVV] estate civil suit in the amount of $15,000 from [XXX] Insurance into his 079 personal account. (P.E. 137, 128; P.E. 108.)

(122) Respondent's 079 personal account was not a denominated segregated account for client funds. (P.E. 137, 129.)

(123) Of the $30,000:

(a) $6,700 was deposited into the [UUU] estate account no. [ ] at [MM] Bank and Trust, on April 12, 1987, by 079 personal account check no. 285; (P.E. 137, 130(a).)

(b) $15,779.25 was deposited into the "[respondent]" [MM] Bank and Trust account no. [ ], [respondent] account, on April 13, 1987, by 079 personal account check no. 292; (P.E. 137, 130(b); P.E. 109(b); P.E. 19(c); P.E. 109(d).) and,

(c) $7,520.75 was kept by respondent as his fee for handling the civil action. (P.E. 137, 130(c).)

(124) As of April 13, 1987, respondent was obligated to maintain at least $15,779.25 in the [respondent] account unless and until those funds were paid out by respondent on behalf of the estate. (P.E. 137, 131.)

(125) The [respondent] account was not a denominated segregated account for client funds. (P.E. 137, 132; P.E. 109(a).)

(126) On April 22, 1987, respondent withdrew $5,000 from the [respondent] account. (P.E. 137, 133; P.E. 109(e).)

(a) This $5,000 was withdrawn by respondent, purportedly as a "loan." (P.E. 137, 133(a).)

(b) The $5,000 was used by respondent to pay a fee due respondent by another client, [S]. (P.E. 137, 133(b).)

(c) Respondent asked [HH] to lend the money. (P.E. 137, 133(c).)

(d) Respondent did not advise [HH] of the identity of the "borrower" of the money. (P.E. 137, 133(d).)

(e) Respondent did not advise [HH] that the $5,000 would be used to pay [S's] fee due respondent. (P.E. 137, 133(e).)

(f) No documents were executed to secure the loan. (P.E. 137, 133(f).)

(g) Respondent advised petitioner in an August 31, 1990 letter that [S] requested that respondent secure a loan to pay respondent's legal fee and other debts. (P.E. 137, 133(g).)

(i) This statement was false and respondent knew it to be false. (N.T. 207-208; 210.)

(ii) [S] did not know of or consent to any "loan" to him to be used to satisfy respondent's bill or other debts. (N.T. 207-208.)

(127) Withdrawal of the $5,000 on April 22, 1987 reduced the [respondent] account balance to $10,800, at which time respondent was entrusted with $15,779.25. (P.E. 137, 134; P.E. 109(b).)

(128) On April 27, 1987, respondent attempted to repay the $5,000 by his deposit into the [respondent] account of a check drawn on respondent's [T] Savings

Bank account no. [ ]. (P.E. 137, 135; P.E. 109(f); P.E. 109(g).)

(129) However, on May 4, 1987, that $5,000 check drawn on the [T] account was returned unpaid due to insufficient funds. (P.E. 137, 136; P.E. 109(i).)

(130) Thus, the $5,000 was not repaid. (P.E. 137, 137.)

(131) On May 7, 1987, respondent withdrew $1,000 from the [respondent] account. (P.E. 137, 138; P.E. 109(h).)

(132) This $1,000 was deposited on May 7, 1987 into the [UUU] estate account. (P.E. 137, 139.)

(133) Disbursement of this $1,000 on May 7, 1987 reduced respondent's entrustment in the [respondent] account to $14,779.25, at which time the account balance was $9,836.32. (P.E. 137, 140; P.E. 109(h).)

(134) Thereafter, on May 21, 1987, respondent withdrew $1,600 from the [respondent] account. (P.E. 137, 141; P.E. 109(h); P.E. 109(j).)

(135) This $1,600 was deposited on May 21, 1987 into the [UUU] estate account. (P.E. 137, 142.)

(136) Disbursement of this $1,600 on May 21, 1987 reduced respondent's entrustment in the [respondent] account to $13,179.25, at which time the account balance was $8,236.32. (P.E. 137, 143; P.E. 109(h).)

(137) On June 5, 1987, respondent withdrew $8,260 from the [respondent] account. (P.E. 137, 144; P.E. 109(k); P.E. 109(l).)

(a) Respondent used the $8,260 to purchase treasurer's check no. J7978. (P.E. 137, 144(a).)

(b) On June 5, 1987, respondent deposited the $8,260 treasurer's check into his 079 personal account. (P.E. 137, 144(b).)

(138) Withdrawal of the $8,260 on June 5, 1987 reduced the [respondent] account balance to $19.50, at which time respondent was entrusted with $13,179.25. (P.E. 137, 145; P.E. 109(k).)

(139) Thereafter, there was no activity in the [respondent] account. (P.E. 137, 146.)

(140) Between June 5, 1987 and July 17, 1987, 44 checks unrelated to the [UUU] estate cleared respondent's 079 personal account. (P.E. 137, 147.) Those checks were:

(a) Check no. 428, in the amount of $1,152.18, dated May 29, 1987, payable to "[U];" (P.E. 137, 147(a); P.E. 110(a).)

(b) Check no. 432, in the amount of $10, dated June 2, 1987, payable to "cash;" (P.E. 137, 147(b); P.E. 110(b).)

(c) Check no. 426, in the amount of $10, dated June 1, 1987, payable to "[DDDD];" (P.E. 137, 147(c); P.E. 110(c).)

(d) Check no. 415, in the amount of $73.26, dated May 27, 1987, payable to "[EEEE], Publishers;" (P.E. 137, 147(d); P.E. 110(d).)

(e) Check no. 375, in the amount of $10, dated May 12, 1987, payable to "[XX];" (P.E. 137, 147(e); P.E. 110(e).)

(f) Check no. 437, in the amount of $20, dated June 3, 1987, payable to "[FFFF];" (P.E. 137, 147(f); P.E. 110(f).)

(g) Check no. 436, in the amount of $25, dated June 3, 1987, payable to "[    ] County Domestic Relations;" (P.E. 137, 147(g); P.E. 110(g).)

(h) Check no. 441, in the amount of $50, dated June 2, 1987, payable to "cash;" (P.E. 137, 147(h); P.E. 110(h).)

(i) Check no. 443, in the amount of $67.47, dated June 4, 1987, payable to "[GGGG's] Nurseries;" (P.E. 137, 147(i); P.E. 110(i).)

(j) Check no. 440, in the amount of $120, dated June 4, 1987, payable to "[HHHH];" (P.E. 137, 147(j); P.E. 110(j).)

(k) Check no. 434, in the amount of $14, dated June 3, 1987, payable to "Federal Express Corporation;" (P.E. 137, 147(k); P.E. 110(k).)

(l) Check no. 444, in the amount of $18.54, dated June 5, 1987, payable to "[IIII];" (P.E. 137, 147(l); P.E. 110(l).)

(m) Check no. 205, in the amount of $50, dated March 23, 1987, payable to "The Prothonotary—Superior Court;" (P.E. 137, 147(m); P.E. 110(m).)

(n) Check no. 445, in the amount of $70, dated June 6, 1987, payable to "[JJJJ];" (P.E. 137, 147(n); P.E. 110(n).)

(o) Check no. 435, in the amount of $82.50, dated June 3, 1987, payable to "Pennsylvania Bar Association;" (P.E. 137, 147(o); P.E. 110(o).)

(p) Check no. 447, in the amount of $125.04, dated June 5, 1987, payable to "[H];"(P.E. 137, 147(p); P.E. 110(p).)

(q) Check no. 442, in the amount of $176.75, dated June 5, 1987, payable to "[KKKK];" (P.E. 137, 147(q); P.E. 110(q).)

(r) Check no. 446, in the amount of $182.21, dated June 5, 1987, payable to "[LLLL];" (P.E. 137, 147(r); P.E. 110(r).)

(s) Check no. 448, in the amount of $51.50, dated June 5, 1987, payable to "[MMMM] Products;" (P.E. 137, 147(s); P.E. 110(s).)

(t) Check no. 433, in the amount of $2.50, dated June 3, 1987, payable to "[NNNN] Mental Health Center;" (P.E. 137, 147(t); P.E. 110(t).)

(u) Check no. 451, in the amount of $20, dated June 9, 1987, payable to "[JJJJ];" (P.E. 137, 147(u); P.E. 110(u).)

(v) Check no. 424, in the amount of $174.37, dated June 4, 1987, payable to "[OOOO] Restaurant;" (P.E. 137, 147(v); P.E. 110(v).)

(w) Check no. 374, in the amount of $50, dated May 12, 1987, payable to "[BB];" (P.E. 137, 147(w); P.E. 110(w).)

(x) Check no. 395, in the amount of $65.86, dated May 22, 1987, payable to "[PPPP] Tires;" (P.E. 137, 147(x); P.E. 110(x).)

(y) Check no. 409, in the amount of $97.66, dated May 27, 1987, payable to "[PPPP] Tires;" (P.E. 137, 147(y); P.E. 110(y).)

(z) Check no. 450, in the amount of $200, dated June 9, 1987, payable to "[BB];" (P.E. 137, 147(z); P.E. 110(z).)

(aa) Check no. 449, in the amount of $471.78, dated June 9, 1987, payable to "[    ] Borough;" (P.E. 137, 147(aa); P.E. 110(aa).)

(bb) Check no. 453, in the amount of $61.64, dated June 9, 1987, payable to "[YY];" (P.E. 137, 147(bb); P.E. 110(bb).)

(cc) Check no. 452, in the amount of $183, dated June 9, 1987, payable to "[YY];" (P.E. 137, 147(cc); P.E. 110(cc).)

(dd) Check no. 346, in the amount of $23, dated May 4, 1987, payable to "County of [    ];" (P.E. 137, 147(dd); P.E. 110(dd).)

528

(ee) Check no. 454, in the amount of $50, dated June 15, 1987, payable to "[JJJJ];" (P.E. 137, 147(ee); P.E. 110(ee).)

(ff) Check no. 425, in the amount of $30, dated May 29, 1987, payable to "[QQQQ];" (P.E. 137, 147(ff); P.E. 110(ff).)

(gg) Check no. 459, in the amount of $38, dated June 17, 1987, payable to "[FFFF];" (P.E. 137, 147(gg); P.E. 110(gg).)

(hh) Check no. 458, in the amount of $85, dated June 15, 1987, payable to "[RRRR];" (P.E. 137, 147(hh); P.E. 110(hh).)

(ii) Check no. 321, in the amount of $25, dated April 27, 1987, payable to "[    ] County Democratic Committee;" (P.E. 137, 147(ii); P.E. 110(ii).)

(jj) Check no. 429, in the amount of $205.71, dated June 17, 1987, payable to "[KKK] Bank;" (P.E. 137, 147(jj); P.E. 110(jj).)

(kk) Check no. 430, in the amount of $205.71, dated June 17, 1987, payable to "[KKK] Bank;" (P.E. 137, 147(kk); P.E. 110(kk).)

(11) Check no. 455, in the amount of $600, dated July 13, 1987, payable to "[MM] Bank;" (P.E. 137, 147(11); P.E. 110(11).)

(mm) Check no. 461, in the amount of $159.36, dated July 14, 1987, payable to "[MM] Bank;" (P.E. 137, 147(mm); P.E. 110(mm).)

(nn) Check no. 467, in the amount of $50, dated July 14, 1987, payable to "[SSSS];" (P.E. 137, 147(nn); P.E. 110(nn).)

(oo) Check no. 468, in the amount of $100, dated July 15, 1987, payable to "[MM] Bank;" (P.E. 137, 147(oo); P.E. 110(oo).)

(pp) Check no. 469, in the amount of $280.50, dated July 15, 1987, payable to "[MM] Bank;" (P.E. 137, 147(pp); P.E. 110(pp).)

(qq) Check no. 465, in the amount of $255.41, dated July 14, 1987, payable to "[W];" (P.E. 137, 147(qq); P.E. 110(qq).) and,

(rr) Check no. 470, in the amount of $900, dated July 17, 1987, payable to "[MM] Bank." (P.E. 137, 147(rr); P.E. 110(rr).)

(141) Also on July 17, 1987, respondent remitted to [HH] check no. 463 drawn on respondent's 079 personal account, in the amount of $2,500. (P.E. 137, 148; P.E. 111.)

(142) Disbursement of the $2,500 to [HH] reduced respondent's entrustment to $10,679.25. (P.E. 137, 149.)

(143) After this $2,500 disbursement to [HH] the balance in respondent's 079 personal account was reduced to *negative* $209.10. (P.E. 137, 150; P.E. 71(d).)

(144) Respondent thus misappropriated estate funds totalling $10,679.25 ($15,779.25 - $1,000 (see para. 140 *supra*) - $1,600 (see para. 143 *supra*) - $2,500 (see para. 149 *supra*)). (P.E. 137, 133, 135, 136, 137, 147; P.E. 109(e); P.E. 109(i); P.E. 109(l); P.E. 110(a)-(rr).)

(145) About one year later, on June 9, 1988, by check no. 1108 drawn on respondent's [CCCC] attorney at law account, no. [    ], respondent deposited $1,000 of his personal funds into the [UUU] estate account. (P.E. 137, 152.)

(146) On June 13, 1988, by check no. 1114 drawn on respondent's [CCCC] attorney at law account, respondent deposited $9,300 of his personal funds into the [UUU] estate account. (P.E. 137, 153.)

(147) On July 11, 1988, respondent reduced to $0 the [UUU] estate account by the clearing of check no. 109, payable to [CCCC] Bank in the amount of $10,026.40. (P.E. 137, 154.)

(148) On July 11, 1988, respondent deposited the $10,026.40 into a newly-opened [UUU] estate account at [CCCC] Bank, no. [     ]. (P.E. 137, 155.)

(149) Thereafter, on July 20, 1988, respondent withdrew $7,000 in cash from the [UUU] estate account, reducing the balance to $3,039.78. (P.E. 137, 156.)

(150) None of the $7,000 was used for or on behalf of the [UUU] estate. (P.E. 137, 157.)

(151) On October 27, 1988, respondent withdrew $1,500 from the [UUU] estate account, reducing the account balance to $1,582.44. (P.E. 137, 158.)

(152) None of the $1,500 was used for or on behalf of the [UUU] estate. (P.E. 137, 158.)

(153) On February 24, 1989, respondent withdrew $471.63 from the [UUU] estate account, reducing the account balance to $1,138.70. (P.E. 137, 160.)

(154) The $471.63 was used to satisfy legitimate [UUU] estate debts. (P.E. 137, 161.)

(155) On May 5, 1989, respondent withdrew $1,100 from the [UUU] estate account, reducing the account balance to $48.38. (P.E. 137, 162; P.E. 112(a); P.E. 112(b).)

(156) None of this $1,100 was used for or on behalf of the [UUU] estate. (P.E. 137, 163.)

(157) Thereafter, respondent remitted $9,230.65 to Attorney [RR], who remitted those funds to Attorney [ZZZ] in December 1989 in settlement of [YYY's] claim. (See para. 123, Charge IV, *supra.*) (P.E. 137, 164.)

(158) Additionally, during the course of the administration of the estate, five other checks totalling $2,650 were drawn by respondent on two different [UUU] estate accounts and made payable to respondent or on respondent's behalf, including: (P.E. 137, 165.)

(a) Check no. 101, in the amount of $300, dated July 31, 1986, drawn on a *previous* [UUU] estate account, no. [    ], and annotated "loan pay back;" (P.E. 137, 165(a); P.E. 113(a).)

(b) Check no. 105, in the amount of $600, dated August 7, 1986, drawn on a *previous* [UUU] estate account, no. [    ] and annotated "legal fees pre-estate work;" (P.E. 137, 165(b); P.E. 113(b).)

(c) Check no. 106, in the amount of $625, dated September 5, 1986, drawn on a *previous* [UUU] estate account, no. [    ], and annotated "legal fees;" (P.E. 137, 165(c); P.E. 113(c).)

(d) Check no. 3, in the amount of $500, dated December 21, 1986, drawn on the [UUU] estate account; (P.E. 137, 165(d); P.E. 113(d).) and,

(e) Check no. 4, in the amount of $600, dated December 21, 1986, drawn on the [UUU] estate account, and annotated "[UUU] — legal fees." (P.E. 137, 165(e); P.E. 113(e).)

### Charge VI ([TTTT]/[UUUU])

(159) On December 19, 1988, respondent deposited into his [CCCC] attorney at law account, a treasurer's check in the amount of $5,000. (P.E. 137, 168; P.E. 114(a).)

(a) This treasurer's check was payable to [TTTT] and endorsed by [TTTT]. (P.E. 137, 168(a); P.E. 114(b).)

(b) This $5,000 represented funds entrusted to respondent. (P.E. 137, 168(b).)

(160) Respondent's [CCCC] attorney at law account was not a denominated segregated account for client funds. (P.E. 137, 169.)

(161) On December 16, 1988, respondent deposited personal funds into the [CCCC] attorney at law account totalling $335, consisting of $200 from [    ] and [    ] [VVVV], $75 from the Women's Auxiliary of [    ] County General Hospital, $40 from [WWWW], annotated "Aug & Dec. '88 rent," and $20 from [    ] and [    ] [QQ], annotated "Dec. Rent." (P.E. 137, 170.)

(162) Thereafter, until respondent paid out the funds on behalf of [TTTT], he continuously failed to maintain at least $5,000 in his [CCCC] attorney at law account. (P.E. 137, 171; P.E. 114(a).)

(163) Respondent misappropriated portions of the $5,000. (P.E. 114(a); P.E. 115(a)-(m).)

(164) Between December 19, 1988 and December 23, 1988, 13 checks unrelated to the [TTTT] matter cleared respondent's [CCCC] attorney at law account. (P.E. 137, 173.) Those checks were:

(a) Check no. 1291, in the amount of $73.24, dated December 14, 1988, payable to "[YY];" (P.E. 137, 173(a); P.E. 115(a).)

(b) Check no. 1270, in the amount of $327.12, dated December 13, 1988, payable to "Bell of Pennsylvania;" (P.E. 137, 173(b); P.E. 115(b).)

(c) Check no. 1288, in the amount of $1,598.70, dated December 12, 1988, payable to "[    ] & [    ] [XXXX];" (P.E. 137, 173(c); P.E. 115(c).)

(d) Check no. 1272, in the amount of $9, dated December 8, 1988, payable to "[XX];" (P.E. 137, 173(d); P.E. 115(d).)

(e) Check no. 1301, in the amount of $50, dated December 16, 1988, payable to "United States Postal Service;" (P.E. 137, 173(e); P.E. 115(e).)

(f) Check no. 1292, in the amount of $107, dated December 13, 1988, payable to "[YYYY] Agency—[ZZZZ] Company;" (P.E. 137, 173(f); P.E. 115(f).)

(g) Check no. 1300, in the amount of $200, dated December 16, 1988, payable to "[OO] family trust;" (P.E. 137, 173(g); P.E. 115(g).)

(h) Check no. 1306, in the amount of $30, dated December 21, 1988, payable to "cash;" (P.E. 137, 173(h); P.E. 115(h).)

(i) Check no. 1299, in the amount of $773.53, dated December 15, 1988, payable to "[AAAAA];" (P.E. 137, 173(i); P.E. 115(i).)

(j) Check no. 1257, in the amount of $7.50, dated December 6, 1988, payable to "[BBBBB];" (P.E. 137, 173(j); P.E. 115(j).)

(k) Check no. 1258, in the amount $7.50, date illegible, payable to "[BBBBB] Inc.;" (P.E. 137, 173(k); P.E. 115(k).)

(l) Check no. 1307, in the amount of $300, dated December 22, 1988, payable to "cash;" (P.E. 137, 173(l); P.E. 115(l).) and,

(m) Check no. 1289, in the amount of $194.69, dated December 13, 1988, payable to "[WW];" (P.E. 137, 173(m); P.E. 115(m).)

(165) Also between December 19, 1988, and December 23, 1988, respondent made two MAC withdrawals from the [CCCC] attorney at law account, which withdrawals were unrelated to the [TTTT] matter totalling $250. (P.E. 137, 174; P.E. 114(a).)

534

(166) On December 22, 1988, the balance in respondent's [CCCC] attorney at law account was $4,121.15. (P.E. 137, 175; P.E. 114(a).)

(167) On December 23, 1988, check no. 1305 drawn on respondent's [CCCC] attorney at law account and dated December 16, 1988, was presented for payment. (P.E. 137, 176; P.E. 114(a); P.E. 116.)

(a) This check was in the amount of $5,000, payable to the "U.S. Attorney's Office," and annotated "[TTTT]." (P.E. 137, 176(a); P.E. 116.)

(b) As of December 23, 1988, after clearance of check no. 1305, the balance in respondent's [CCCC] attorney at law account was reduced to *negative* $1,373.54. (P.E. 137, 176(b); P.E. 114(a).)

(168) On February 23, 1989, respondent deposited into his "[respondent], escrow, attorney at law" account at [CCCC] Bank, no. [    ], [CCCC] escrow account, a check in the amount of $22,000. (P.E. 137, 177; P.E. 117(a); P.E. 117(b); P.E. 117(c).)

(a) This check was drawn on the personal account of [UUUU] and annotated "in escrow for [CCCCC] property." (P.E. 137, 177(a); P.E. 117(c).)

(b) This $22,000 represented funds entrusted to respondent. (P.E. 137, 177(b).)

(c) [UUUU] gave respondent the money to be used to purchase property owned by [CCCCC]. (P.E. 137, 177(c).)

(d) If the purchase could not take place by May 25, 1989, the money, with interest, was to be returned to [UUUU]. (P.E. 137, 177(d).)

(169) Thereafter, until respondent paid out the funds on behalf of [UUUU], he continuously failed to maintain at least $22,000 in his [CCCC] escrow account. (P.E.

137, 178; P.E. 117(a); P.E. 117(d); P.E. 117(e); P.E. 117(f).)

(170) Respondent misappropriated portions of the $22,000. (P.E. 117(a); P.E. 117(d); P.E. 117(e); P.E. 117(f); P.E. 120(a)-(c).)

(171) Between February 23, 1989 and May 19, 1989, three checks not for the benefit of [UUUU], cleared respondent's [CCCC] escrow account. (P.E. 137, 180.) Those checks were:

(a) Check no. 103, in the amount of $3,000, dated February 24, 1989, payable to "[respondent];" (P.E. 137, 180(a); P.E. 120(a).)

(b) Check no. 104, in the amount of $400, dated March 8, 1989, payable to "[CCCC] Bank" and annotated "[CCCCC];" (P.E. 137, 180(b); P.E. 120(b).) and,

(c) Check no. 107, in the amount of $2,000, dated March 9, 1989, payable to "[DDDDD]." (P.E. 137, 180(c); P.E. 120(c).)

(172) On May 19, 1989, the balance in respondent's [CCCC] escrow account was $20,456.16. (P.E. 137, 181; P.E. 117(f).)

(173) On May 22, 1989, check no. 109 drawn on respondent's [CCCC] escrow account was presented for payment. (P.E. 137, 182; P.E. 117(f); P.E. 121(b).)

(a) The check was made payable to [UUUU], in the amount of $22,253.15. (P.E. 137, 182(a); P.E. 121(b).)

(b) The additional $253.15 which respondent remitted to [UUUU] represented interest earned on the $22,000. (P.E. 137, 182(b).)

(c) As of May 22, 1989, after clearance of check no. 109, the balance in respondent's [CCCC] escrow

account was reduced to *negative* $1,796.99. (P.E. 137, 182(c); P.E. 117(f).)

*Charge VII ([EEEEE] Estate)*

(174) On August 26, 1988, [EEEEE], decedent, died, intestate, as a result of a multiple vehicle accident, while a resident [    ] County and owning only personal property. (P.E. 137, 184.)

(175) Decedent was a recent law school graduate and had just begun employment with respondent. (P.E. 137, 185.)

(176) On September 1, 1988, letters of administration were granted to [FFFFF], decedent's mother. (P.E. 137, 186.)

(177) On September 15, 1988, [FFFFF] executed two documents. (P.E. 137, 187.)

(a) One was a fee agreement and power of attorney which related to "a claim for damages" arising out of the accident and entitled respondent to a fee of one-third "... of the gross amount that is obtained or collected through settlement and 40 PERCENT if tried...." (emphasis in original) (P.E. 137, 187(a); P.E. 122.)

(b) The other document was a fee agreement which related to the administration of the estate, for which services respondent was to receive 5 percent of the gross estate. (P.E. 137, 187(b); P.E. 123.)

(c) However, respondent advised [FFFFF] that he did not intend to charge her the 5 percent fee for estate administration. (P.E. 137, 187(c).)

(178) An estate account was opened at [GGGGG] Bank captioned "estate of [EEEEE] c/o [respondent]," no. [    ], "[EEEEE] estate account." (P.E. 137, 188.)

(a) [FFFFF] had sole signatory authority over the account. (P.E. 137, 188(a); P.E. 124(a).)

(b) Statements of account and cancelled checks were directed to respondent at his office at [    ]. (P.E. 137, 188(b); P.E. 124(b).)

(179) [FFFFF] signed, in blank, eight "temporary checks" issued on the [EEEEE] estate account. (P.E. 137, 189.)

(180) The following estate assets totalling $13,219.34 were received by respondent and deposited into the [EEEEE] estate account on the following dates: (P.E. 137, 190.)

(a) On October 7, 1988, a check from [HHHHH] in the amount of $1,048.74, representing closure of an account held by decedent and which deposit opened the [EEEEE] estate account; (P.E. 137, 190(a); P.E. 124(c); P.E. 124(d).)

(b) On November 2, 1988, a check from [XXX] Insurance in the amount of $7,500, representing funeral expenses and accidental death benefits from decedent's insurance carrier; (P.E. 137, 190(b); P.E. 124(g); P.E. 124(h).)

(c) On November 21, 1988, a check from [IIIII] Credit Union, in the amount of $127.10, representing closure of an account held by decedent; (P.E. 137, 190(c); P.E. 124(k); P.E. 124(l).)

(d) On November 29, 1988, a check from [XXX] Insurance in the amount of $55, representing a premium refund from decedent's insurance carrier; (P.E. 137, 190(d); P.E. 124(m); P.E. 124(n).)

(e) On December 30, 1988, a check from [XXX] Insurance in the amount of $4,464, representing collision coverage on decedent's automobile; (P.E. 137, 190(e); P.E. 124(p); P.E. 124(q).) and,

(f) On June 9, 1989, a check from [JJJJJ], in the amount of $24.50, representing dividends on shares

decedent had held. (P.E. 137, 190(f); P.E. 124(vv); P.E. 124(ww).)

(181) Additionally, the following estate assets totalling $11,500 were received by respondent, and were deposited into respondent's [CCCC] attorney at law account, and not into the [EEEEE] estate account: (P.E. 137, 191.)

(a) A check from [XXX] Insurance dated December 27, 1988 and deposited on December 30, 1988, in the amount of $10,000, representing payment of seat belt coverage under the decedent's policy; (P.E. 137, 191(a); P.E. 114(a), pg. 3; P.E. 125(a); P.E. 125(b).) and,

(b) A check from [XXX] Insurance dated January 3, 1989 and deposited on January 13, 1989, in the amount of $1,500, representing payment for funeral expenses as provided under the Workers' Compensation Act. (P.E. 137, 191(b); P.E. 126(a); P.E. 126(b); P.E. 126(c).)

(182) Respondent's [CCCC] attorney at law account was not a denominated segregated account for client funds. (P.E. 137, 192.)

(183) By January 13, 1989, respondent had received and negotiated five checks from [XXX] Insurance, totalling $23,519. (P.E. 137, 193; P.E. 124(h); P.E. 124(n); P.E. 124(q); P.E. 125(b); P.E. 126(c).)

(a) None of these checks represented payment of a "claim for damages," under the contingent fee agreement. (P.E. 137, 193(a).)

(b) These checks were the fulfillment of the contractual obligation between [XXX] Insurance and its insured, decedent. (P.E. 137, 193(b).)

(184) Respondent improperly treated the $23,519 first party benefits received from [XXX] Insurance as if

they were damages received from a tortfeasor. (P.E. 137, 193; P.E. 129(a), P.D.E. 25(a).)

(185) Respondent, in payment of his "contingent fee," made the following disbursements to himself, totalling $6,775, from the [EEEEE] estate account: (P.E. 137, 195.)

(a) On November 10, 1988, temporary check no. A-2, in the amount of $2,500; (P.E. 137, 195(a); P.E. 124(i).)

(b) On December 29, 1988, temporary check no. A-4, in the amount of $1,275; (P.E. 137, 195(b); P.E. 124(y).) and,

(c) On January 11, 1989, temporary check no. A-5, in the amount of $3,000. (P.E. 137, 195(c); P.E. 124(dd).)

(186) Additionally, of the $11,500 which respondent deposited into his [CCCC] attorney at law account: (P.E. 137, 196.)

(a) $8,520.42 was ultimately used by respondent to pay for decedent's funeral expenses; (P.E. 137, 196(a); P.E. 133.) and,

(b) The balance, that being $2,979.58, was improperly retained by respondent in payment of his "contingent fee." (P.E. 137, 196(b); P.E. 129(a), P.D.E. 25(a).)

(187) Thus, "contingent fee" disbursements to respondent totalled $9,754.58 ($6,775 + $2,979.58). (P.E. 137, 197.)

(a) However, one-third of $23,519 totals only $7,839.66. (P.E. 137, 197(a).)

(b) Therefore, respondent's withdrawals exceeded the one-third "contingent fee" by $1,914.92 ($9,754.58 - $7,839.66). (P.E. 137, 197(b).)

(188) In January 1989, respondent asked [FFFFF] if he could use money left over in the [EEEEE] estate

account after payment of the estate debts. (P.E. 137, 198.)

(189) Respondent advised [FFFFF] that he needed the money in order to cover the expense of trial preparation for the civil action. (N.T. 253.)

(a) Respondent offered to pay interest on the money. (N.T. 253.)

(b) [FFFFF] questioned respondent about the type of expenses to which he was referring. (N.T. 226-227.)

(c) Respondent stated that the money would be used for expenses such as a videotape of the accident scene. (N.T. 227.)

(d) [FFFFF] consented to respondent using money left in the [EEEEE] estate account after payment of estate debts for use in trial preparation. (N.T. 226-227.)

(190) Thereafter, by temporary check no. A-7, dated January 18, 1989, drawn on the [EEEEE] estate account, respondent disbursed $5,000 to himself as a "loan." (P.E. 137, 200; P.E. 124(ff).)

(191) In a January 16, 1990 letter to petitioner, respondent asserted that he used the $5,000 "loan" "... on office expenses. He [respondent] did not keep accurate records since it was a loan from [FFFFF]." (P.E. 137, 201.)

(192) The $5,000 was taken as a personal loan by respondent. (P.E. 137, 202.)

(193) Respondent misrepresented to [FFFFF] the purpose for which the $5,000 was to be used. (N.T. 226-227; 253.)

(194) As of January 19, 1989, respondent had received a total of $14,754.48 from [EEEEE] estate assets, comprised of: (P.E. 137, 197.)

(a) $7,839.66 improperly claimed as one-third "contingent fee;" (P.E. 137, 197(a).)

(b) $1,914.92 improperly withdrawn over and above the one-third "contingent fee;" and, (P.E. 137, 197(b).)

(c) $5,000 purportedly for trial preparation. (N.T. 253.)

(195) After temporary check no. A-7 in the amount of $5,000 payable to respondent cleared the [EEEEE] estate account on January 19, 1989, the [EEEEE] estate account balance was reduced to $1,342.83. (P.E. 137, 205; P.E. 124(ee).)

(196) Thereafter, [EEEEE] estate check no. 104 in the amount of $2,000 payable to decedent's grandmother for repayment of a loan to decedent was presented for payment. (P.E. 137, 206; P.E. 124(gg).)

(a) On January 23, 1989, $2,000 was deducted from the [EEEEE] estate account and the balance was reduced to *negative* $657.17. (P.E. 137, 206(a); P.E. 124(ee).)

(b) On January 24, 1989, the $2,000 check to decedent's grandmother was returned unpaid due to insufficient funds. (P.E. 137, 206(b); P.E. 124(hh).)

(c) Also on January 24, 1989, respondent deposited his own funds into the [EEEEE] estate account by check no. 1388, in the amount of $1,275, drawn on his [CCCC] attorney at law account. (P.E. 137, 206(c); P.E. 124(ii); P.E. 124(jj).)

(d) The balance on January 24, 1989 was thus $2,607.83. (P.E. 137, 206(d); P.E. 124(ee).)

(197) On February 3, 1989, by temporary check no. A-8, drawn on the [EEEEE] estate account, respondent withdrew $2,000. (P.E. 137, 207; P.E. 124(kk).)

(a) With the proceeds from the $2,000 check, respondent purchased a treasurer's check in the amount of $2,005. (P.E. 137, 207(a).)

(b) Respondent then forwarded the $2,005 treasurer's check to decedent's grandmother. (P.E. 137, 207(b).)

(198) On or about May 4, 1989, at [FFFFF's] request, respondent made an advance distribution to [FFFFF] in the amount of $5,000. (P.E. 137, 208.)

(199) This $5,000 payment, by treasurer's check to [FFFFF] represented respondent's return of the January 19, 1989 $5,000 disbursement to respondent. (P.E. 137, 209.)

(200) Of the $14,754.48 which respondent paid to himself, respondent returned a total of $6,275 ($1,275 + $5,000) to the estate, or paid it out on behalf of the estate. (P.E. 137, 210.)

(201) Thus, as of May 5, 1989, respondent had improperly retained for himself a total of $8,479.58 ($14,754.48 - $6,275). (P.E. 137, 211.)

(202) By letter dated August 28, 1989, [FFFFF] wrote to respondent and advised that: (P.E. 137, 212; P.E. 130.)

(a) He had given her "... no accounting of what you have received and from whom;" (P.E. 137, 212(a); P.E. 130.)

(b) "You may have borrowed money for your personal use from the estate account;" (P.E. 137, 212(b); P.E. 130.)

(c) She was revoking the power of attorney; (P.E. 137, 212(c); P.E. 130.) and,

(d) She asked that respondent turn over the files and bank account records to Attorney [KKKKK]. (P.E. 137, 212(d); P.E. 130.)

(203) By letter dated September 25, 1989, respondent wrote to Attorney [KKKKK]. (P.E. 137, 213; P.E. 129 (a), P.D.E. 24.) Therein respondent stated that among other things:

(a) He was "directed" by [FFFFF] "... to use the balance of the money to cover the expenses;" (P.E. 137, 213(a); P.E. 129(a), P.D.E. 24.) and,

(b) It would take respondent some time to compile an accounting of expenses. (P.E. 137, 213(b); P.E. 129(a), P.D.E. 24.)

(204) On or about September 29, 1989, respondent met with Attorney [KKKKK] at her office and turned over to her parts of his file regarding the [EEEEE] matter. (P.E. 137, 214.)

(205) By letter dated October 5, 1989, respondent wrote to Attorney [KKKKK] and attached an accounting of his handling of the estate funds. (P.E. 137, 215; P.E. 129(a), P.D.E. 25(a), P.D.E. 25(b).) In that letter, respondent stated that among other things:

(a) He took a "$5,000 retainer from the estate in January of 1989 to get ready for trial, after all the other bills of the estate were paid;" (P.E. 137, 215(a); P.E. 129(a), P.D.E. 25(a).) and,

(b) [FFFFF] and her husband "... offered to let me use the money left in the estate after the expenses. In appreciation for their understanding, I agreed to pay them interest at the rate that I would be paying at a bank if I were to take a term note, which was approximately 12 percent." (P.E. 137, 215(b); P.E. 129(a), P.D.E. 25(a).)

(206) Respondent's representation that he took the $5,000 "after all the other bills of the estate were paid" was false. (P.E. 137, 216(c).) In fact:

(a) Removal of the $5,000 from the [EEEEE] estate account caused estate check no. 104 payable to decedent's grandmother to be dishonored; (P.E. 137, 216(a); P.E. 124(ee).)

(b) Only two estate bills had been paid by the time respondent withdrew the $5,000; (P.E. 137, 216(b); P.E. 124(e); P.E. 133.) and,

(c) The remaining estate bills were not paid by respondent until March of 1989. (P.E. 137, 216(c); P.E. 124(mm); P.E. 124(nn); P.E. 124(oo); P.E. 124(pp); P.E. 124(qq); P.E. 124(rr).)

(207) Also in respondent's October 5, 1989 letter to Attorney [KKKKK]: (P.E. 137, 217.)

(a) He stated that "check nos. A-2 [$2,500], A-4 [$1,275] and A-5 [$3,000] were payments per fee agreement for 1/3rd of proceeds collected." (P.E. 137, 217(a); P.E. 129(a), P.D.E. 25(a).)

(b) He further stated that after the $10,000 for seat belt coverage was "... collected, $8,520.42 was wire-transfered [sic] to the funeral home. The balance, $1,479.58 was transfered [sic] to my account as part of my contingency fee;" (P.E. 137, 217(b); P.E. 129(a), P.D.E. 25(a).) and,

(c) He also stated that he used the $1,500 workers' compensation payment as the "... balance of my fees for the $10,000 check." (P.E. 137, 217(c); P.E. 129(a), P.D.E. 25(a).)

(208) Additionally, in the accounting forwarded to Attorney [KKKKK] with his October 5, 1989 letter, respondent credited the estate with $200 in earned interest on the $5,000 "retainer," and $682.71 representing the last paycheck due to decedent. However, respondent had failed to remit to the estate the $200 and the $682.71. (P.E. 137, 218; P.E. 129(a), P.D.E. 25(b).)

(209) By letter dated October 12, 1989, respondent wrote to [LLLLL] of [XXX] Insurance. (P.E. 137, 219; P.E. 127.) Therein, respondent:

(a) Enclosed the title and other documents related to decedent's car; (P.E. 137, 219(a); P.E. 127.)

(b) Failed to advise [LLLLL] that he had been discharged; (P.E. 137, 219(b); P.E. 127.)

(c) Asked that any additional money be forwarded to Attorney [KKKKK]; (P.E. 137, 219(c); P.E. 127.) and,

(d) Requested that [LLLLL] "... contact me or [KKKKK] for further instructions." (P.E. 137, 219(d); P.E. 127.)

(210) By letter dated October 18, 1989, Attorney [KKKKK] requested that respondent forward the remainder of his file to her, in particular, a videotape respondent indicated he had secured. (P.E. 137, 220; P.E. 129(a), P.D.E. 26.)

(211) By letter dated October 23, 1989, respondent confirmed an earlier conversation with Attorney [KKKKK], wherein he had indicated that the videotape referred to related to general trial preparation. (P.E. 137, 221; P.E. 129(a), P.D.E. 27.)

(212) By letter dated October 30, 1989, Attorney [KKKKK] requested that respondent turn over to her "... any funds which have been entrusted to your possession and which are part of [EEEEE's] estate. (P.E. 137, 222; P.E. 129(a), P.D.E. 28.)

(213) By letter dated November 7, 1989, respondent responded to Attorney [KKKKK's] letter. (P.E. 137, 223; P.E. 129(a), P.D.E. 29.) Therein, respondent among other things:

(a) Asked Attorney [KKKKK] to advise him of the amount "... that the estate should be reimbursed by me...;" (P.E. 137, 223(a); P.E. 129(a), P.D.E. 29.) and,

(b) Stated that upon receipt of that figure, respondent would comply with her "... demand for payment promptly." (P.E. 137, 223(b); P.E. 129(a), P.D.E. 29.)

(214) By letter dated December 7, 1989, Attorney [KKKKK] requested that respondent again provide her with the original cancelled checks in regard to the [EEEEE] estate account. (P.E. 137, 224; P.E. 129(a), P.D.E. 30.)

(215) Respondent did not at that time provide the requested bank records. (P.E. 137, 225.)

(216) By letter dated December 12, 1989, Attorney [KKKKK] responded to respondent's November 7, 1989 letter. Therein and with attachments, Attorney [KKKKK] advised respondent that he was to reimburse the estate at least $8,171.68. (P.E. 137, 226; P.E. 129(a), P.D.E. 31.)

(217) By letter dated January 5, 1990, respondent addressed Attorney [KKKKK's] December 12, 1989 letter. (P.E. 137, 227; P.E. 129(a), P.D.E. 32.) Therein, respondent:

(a) Indicated that he was sending the requested original cancelled checks under separate cover; (P.E. 137, 227(a); P.E. 129(a), P.D.E. 32.)

(b) Proposed that the question of the fee due him be settled by "arbitrators;" (P.E. 137, 227(b); P.E. 129(a), P.D.E. 32.) and,

(c) Requested "clarification" of the calculations previously given him by Attorney [KKKKK]. (P.E. 137, 227(c); P.E. 129(a), P.D.E. 32.)

(218) By letter dated January 17, 1990, Attorney [KKKKK] addressed respondent's January 5 letter. (P.E. 137, 228; P.E. 129(a), P.D.E. 33.) Therein, Attorney [KKKKK]:

(a) Indicated that she still had not received the original cancelled checks; (P.E. 137, 228(a); P.E. 129(a), P.D.E. 33.)

(b) Indicated that if respondent remitted the $9,699.98 believed owed, she would escrow the same pending resolution of respondent's claimed fees; (P.E. 137, 228(b); P.E. 129(a), P.D.E. 33.)

(c) Suggested submission of the matter to the [ ] County Bar Association Fee Dispute Committee; (P.E. 137, 228(c); P.E. 129(a), P.D.E. 33.) and,

(d) Requested that respondent supply "justification" for his claimed one third fee. (P.E. 137, 228(d); P.E. 129(a), P.D.E. 33.)

(219) By letter dated January 31, 1990, respondent answered Attorney [KKKKK's] January 17, 1990 letter. (P.E. 137, 229; P.E. 129(a), P.D.E. 34.) Therein, respondent:

(a) Apologized for his "oversight" in not sending the original cancelled checks of the [EEEEE] estate account; (P.E. 137, 229(a); P.E. 129(a), P.D.E. 34.)

(b) Expressed his hesitation in using a local panel of arbitrators and therefore he was "... concerned about turning over the funds to be controlled by you;" (P.E. 137, 229(b); P.E. 129(a), P.D.E. 34.) and,

(c) Posed several questions to Attorney [KKKKK]. (P.E. 137, 229(c); P.E. 129(a), P.D.E. 34.)

(220) By letter dated February 12, 1990, Attorney [KKKKK] responded to respondent's January 31 letter. (P.E. 137, 230; P.E. 129(a), P.D.E. 35.) Therein, Attorney [KKKKK]:

(a) Answered the previous questions posed by respondent; (P.E. 137, 230(a), P.E. 129(a), P.D.E. 35.) and,

(b) Advised respondent that since he had not yet sent the original cancelled estate checks or the funds requested, her client would pursue other means. (P.E. 137, 230(b); P.E. 129(a), P.D.E. 35.)

(221) Respondent then sent a February 14, 1990 letter to Attorney [KKKKK]. (P.E. 137, 231; P.E. 129(a), P.D.E. 36.) Therein, respondent:

(a) Clarified points that he believed to be misunderstood, including the $2,000 sent to decedent's grandmother; (P.E. 137, 231(a); P.E. 129(a), P.D.E. 36.) and,

(b) Advised that the original cancelled checks were lost "in transit" and since the bank had sent her copies respondent was "... at a loss as to what else could be done." (P.E. 137, 231(b); P.E. 129(a), P.D.E. 36.)

(222) By letter dated February 26, 1990, Attorney [KKKKK] again wrote respondent in an attempt to clarify the $2,000 check paid to decedent's grandmother, which check respondent was still questioning. (P.E. 137, 232; P.E. 129(a), P.D.E. 37.)

(223) On or about March 28, 1990, Attorney [KKKKK] filed a petition for citation to show cause seeking to have respondent relinquish the original cancelled checks to the estate account and the $9,699.98 she believed due the estate. (P.E. 137, 233; P.E. 129(a), P.D.E. 38(a).)

(224) By order dated March 28, 1990, the citation upon respondent was granted to show cause why he should not return the checks and funds, returnable May 2, 1990. (P.E. 137, 234; P.E. 129(a), P.D.E. 38(b).)

(225) The May 2, 1990 hearing was not held. (P.E. 137, 235.)

(226) By order of court dated May 16, 1990, respondent was ordered, within 10 days from service

of the order, to return to the administratrix of the estate of [EEEEE]: (P.E. 137, 236; P.E. 129(a), P.D.E. 39.)

(a) All original checks from [EEEEE] estate account; (P.E. 137, 236(a); P.E. 129(a), P.D.E. 39.) and,

(b) $9,699.98 in cash. (P.E. 137, 236(b); P.E. 129(a), P.D.E. 39.)

(227) By certified letter dated May 22, 1990, Attorney [KKKKK] forwarded the May 16 order of court to respondent. (P.E. 137, 237; P.E. 129(a), P.D.E. 40.)

(228) Thereafter, respondent served upon Attorney [KKKKK] his response to petition for citation to show cause and a petition for reconsideration. (P.E. 137, 238; P.E. 129(a), P.D.E. 41.)

(229) By order dated June 19, 1990, a hearing was scheduled for July 17, 1990 in regard to the "petition for citation to show cause filed by the attorney for the estate and all other matters." (P.E. 137, 239; P.E. 129(a), P.D.E. 42(b).)

(230) By consent order dated July 19, 1990, respondent was ordered, "on or before the expiration of 30 days from today" to deliver $9,699.98 to [FFFFF] in care of Attorney [KKKKK]. (P.E. 137, 240; P.E. 129(a), P.D.E. 43.)

(231) By letter dated August 14, 1990, respondent advised Attorney [KKKKK] that there may be a delay in remitting the funds pursuant to the court order. (P.E. 137, 241; P.E. 129(a), P.D.E. 44.)

(232) By letter dated August 16, 1990, Attorney [KKKKK] advised respondent that she expected the funds in her office by September 5, 1990. (P.E. 137, 242; P.E. 129(a), P.D.E. 45.)

(233) By letter and check dated September 4, 1990, respondent remitted $9,699.98 to [FFFFF], through At-

550

torney [KKKKK]. (P.E. 137, 243; P.E. 129(a), P.D.E. 46.)

(234) With regard to the overall administration of the estate of [EEEEE], respondent failed to: (P.E. 137, 244.)

(a) File an inventory; (P.E. 137, 244(a).)

(b) File an inheritance tax return; (P.E. 137, 244(b).)

(c) Make any inheritance tax payments; (P.E. 137, 244(c).) and,

(d) Take any action whatsoever to conclude the administration of the estate. (P.E. 137, 244(d).)

*Charge VIII ([EEEEE] Funds)*

(235) On December 30, 1988, respondent deposited into his [CCCC] attorney at law account, a check from [XXX] Insurance in the amount of $10,000 representing payment of seat belt coverage under decedent's policy. (P.E. 137, 246; P.E. 114(a); P.E. 125(a); P.E. 125(b).)

(236) Of this $10,000: (P.E. 137, 247.)

(a) Respondent improperly claimed $1,479.58 in payment of his "contingent fee" (see paras. 196 and 217(b), Charge VII, *supra*); (P.E. 137, 247(a) 196(b), 217(b); P.E. 129(a), P.D.E. 25(a).) and,

(b) Respondent was to use $8,520.42 to pay decedent's funeral bill. (P.E. 137, 247(b).)

(237) Respondent's [CCCC] attorney at law account was not a denominated segregated account for client funds. (P.E. 137, 248.)

(238) As of December 30, 1988, respondent was obligated to maintain at least $8,520.42 in his [CCCC] attorney at law account on behalf of the estate of [EEEEE]. (P.E. 137, 249.)

(239) Respondent misappropriated portions of the $8,520.42. (P.E. 126(a); P.E. 137, 251, 252; P.E. 131(a)-(k).)

(240) On January 3, 1989, respondent made two MAC withdrawals from the [CCCC] attorney at law account totalling $175, which withdrawals were unrelated to the estate. (P.E. 137, 251; P.E. 126(a).)

(241) Between January 3, 1989, and January 5, 1989, 11 checks unrelated to the estate cleared respondent's [CCCC] attorney at law account. (P.E. 137, 252.) Those checks were:

(a) Check no. 1247, in the amount of $30, dated November 29, 1988, payable to "[     ] County Democratic Committee;" (P.E. 137, 252(a); P.E. 131(a).)

(b) Check no. 1322, in the amount of $358.88, dated December 27, 1988, payable to "[CC] Federal S & L;" (P.E. 137, 252(b); P.E. 131(b).)

(c) Check no. 1323, in the amount of $395.85, dated December 27, 1988, payable to "[CC] Federal;" (P.E. 137, 252(c); P.E. 131(c).)

(d) Check no. 1324, in the amount of $395.85, dated December 27, 1988, payable to "[CC] Federal;" (P.E. 137, 252(d); P.E. 131(d).)

(e) Check no. 1318, in the amount of $396.05, dated December 27, 1988, payable to "[CC] Federal;" (P.E. 137, 252(e); P.E. 131(e).)

(f) Check no. 1325, in the amount of $495.24, dated December 27, 1988, payable to "[CC] Federal;" (P.E. 137, 252(f); P.E. 131(f).)

(g) Check no. 1326, in the amount of $495.24, dated December 27, 1988, payable to "[CC] Federal;" (P.E. 137, 252(g); P.E. 131(g).)

(h) Check no. 1331, in the amount of $1,152.18, dated December 29, 1988, payable to "[U];" (P.E. 137, 252(h); P.E. 131(h).)

(i) Check no. 1341, in the amount of $50, undated, payable to "cash;" (P.E. 137, 252(i); P.E. 131(i).)

(j) Check no. 1334, in the amount of $440, dated December 19, 1988, payable to "[MMMMM];" (P.E. 137, 252(j); P.E. 131(j).) and,

(k) Check no. 1336, in the amount of $748.70, dated December 29, 1988, payable to "[NNNNN]." (P.E. 137, 252(k); P.E. 131(k).)

(242) As of January 5, 1989, the balance in respondent's [CCCC] attorney at law account was $7,354.19. (P.E. 137, 253; P.E. 126(a).)

(243) On January 9, 1989, respondent deposited temporary check no. A-5, in the amount of $3,000 drawn on the [EEEEE] estate account into his [CCCC] attorney at law account. (P.E. 137, 254; P.E. 126(a); P.E. 132(a); P.E. 132(b).)

(a) This $3,000 check was an improper payment to respondent of his claimed one-third "contingent fee" (see paras. 195(c) and 217(a), Charge VII, *supra*); (P.E. 137, 254(a), 195(c), 217(a); P.E. 124(dd); P.E. 129(a), P.D.E. 25(a).)

(b) Respondent cured the [EEEEE] entrustment deficit in his [CCCC] attorney at law account by this deposit. (P.E. 137, 254(b); P.E. 126(a).)

(244) As of January 9, 1989, the balance in respondent's [CCCC] attorney at law account was $10,038.19. (P.E. 137, 255; P.E. 126(a).)

(245) Thereafter, on January 10, 1989, respondent wire transferred $8,520.42 from his [CCCC] attorney at law account to the [OOOOO] Funeral Home in pay-

ment of decedent's funeral bill. (P.E. 137, 256; P.E. 126(a); P.E. 133.)

(246) On January 13, 1989, respondent deposited into his [CCCC] attorney at law account, a check from [XXX] Insurance in the amount of $1,500, representing payment for funeral expenses as provided under the Workers' Compensation Act. (P.E. 137, 257; P.E. 126(a); P.E. 126(b); P.E. 126(c).)

(247) Respondent improperly claimed this $1,500 in payment of his one-third "contingent fee" (see paras. 196 and 217(c), Charge VII, *supra*); (P.E. 137, 258, 196(b), 217(c); P.E. 129(a), P.D.E. 25(a).)

### III. CONCLUSIONS OF LAW

The board has determined that respondent's aforementioned conduct was in violation of the following Disciplinary Rules of the Code of Professional Responsibility and Rules of Professional Conduct:

(a) D.R. 1-102(A)(4), which states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(b) D.R. 1-102(A)(6), which states that a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

(c) D.R. 5-104(A), which states that a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure;

(d) D.R. 6-101(A)(3), which states that a lawyer shall not neglect a legal matter entrusted to him;

(e) D.R. 9-102(A), which states that all funds of clients paid to a lawyer or law firm, other than advances

for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein;

(f) D.R. 9-102(B)(1), which states that a lawyer shall promptly notify a client of the receipt of a client's funds, securities, or other properties;

(g) D.R. 9-102(B)(3), which states that a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them;

(h) D.R. 9-102(B)(4), which states that a lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive;

(i) R.P.C. 1.1, which states that a lawyer shall provide competent representation to a client;

(j) R.P.C. 1.3, which states that a lawyer shall act with reasonable diligence and promptness in representing a client;

(k) R.P.C. 1.8(a), which states that a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client;

(l) R.P.C. 1.15(a), which states that a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safe-

guarded. Complete records of such account funds and other property shall be preserved for a period of five years after termination of the representation;

(m) R.P.C. 1.15(b), which states that a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive;

(n) R.P.C. 1.16(a)(3), which states that a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the lawyer is discharged; and

(o) R.P.C. 8.4(c), which states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

The matter presently before the board involves the resolution of two issues. First, it must be determined whether respondent's actions have constituted a violation of either the Code of Professional Responsibility or the Rules of Professional Conduct. Second, if a violation is established, a pronouncement of the appropriate discipline in light of any mitigating circumstances must be prescribed.

The first issue of whether respondent has acted in violation of his ethical responsibilities has been answered affirmatively. Evidence is sufficient to prove ethical misconduct if a preponderance of that evidence establishes the charged violation and the proof is clear and satisfactory. See *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982). The petition for discipline states eight comprehensive charges against respondent for violations of the Disciplinary Rules of the Code of Professional Responsibility and the Rules

of Professional Conduct. The respondent has stipulated to most of the allegations surrounding these charges.

As specified in the [B]/[C] matter (Charge I), respondent entered into an unauthorized business transaction with his clients when he attempted to purchase their property. Respondent advised and prompted his clients to execute a mortgage when they did not understand the reason for the execution of documents by them concerning their property. Respondent entered into two listing contracts with a real estate agency with regard to his clients' property without the clients' permission. Respondent also misrepresented to the real estate agency that his clients gave him power of attorney. Respondent told the real estate agency that he discussed an offer with his clients and they rejected the offer. This statement was false in that respondent never discussed the offer with his clients. In addition, respondent falsely represented to the Office of Disciplinary Counsel that he had partners in regard to the purchase of his clients' property.

In the [J] matter (Charge II), respondent placed his client's money in an account not designated as an "escrow" or "fiduciary" account. Between September 11, 1987 and January 20, 1988, this account was continuously below the entrusted amount. Respondent misappropriated the funds entrusted to him and commingled these entrusted funds with personal funds. Furthermore, respondent entered into a business transaction with his client when his client and respondent had differing interests.

In the [OO]/[PP] matter (Charge III), respondent put a client's funds into an account that was not a denominated segregated account for client funds. Respondent deposited personal funds into this account. Respondent later transferred these funds into another account which

also was not a denominated segregated account for client funds. This account was continuously below the entrusted amount. Respondent used other clients' entrusted funds to pay amounts he owed to clients whose funds he had misappropriated.

In the matters of the [UUU] estate and the [UUU] funds (Charges IV and V), respondent neglected a legal matter entrusted to him by failing to promptly settle a relatively simple estate. Respondent prepared incomplete and incorrect inheritance tax returns. Respondent failed to keep an accurate record of receipts and disbursements of estate funds; and failed to file an account despite an order by the court. Respondent improperly paid himself commissions and attorney's fees. In addition, respondent arranged a $5,000 "loan" from his client's funds to pay legal fees owed him by another client, the repayment of which was never shown on the record. Respondent also transferred most of the entrusted funds to a personal account which respondent drew checks on for expenses unrelated to his client's affairs.

In the [TTTT]/[UUUU] matter (Charge VI), respondent once again deposited a client's funds into an account that was not a denominated segregated account for client funds. Thereafter, the amount of funds in the account continuously went below the entrusted amount and eventually showed a negative balance. However, respondent deposited in this account $22,000 drawn on the account of another client. Respondent used some of this money for his own purposes.

Additionally, in the matters involving the [EEEEE] estate and the [EEEEE] fund (Charges VII and VIII), respondent kept client funds in a law account that was not a denominated segregated account for client funds. Respondent improperly retained client funds in payment

of his miscalculated fees. Respondent secured $5,000 from the estate funds as a personal loan. Furthermore, respondent continued to represent the client after he had been discharged. Lastly, respondent failed to take any action whatsoever to conclude the administration of the estate.

The brief summary of these charges, to which respondent admitted either by stipulation, admission, or testimony, clearly evidences the numerous violations of the Disciplinary Rules of the Code of Professional Responsibility and the Rules of Professional Conduct stated in the conclusions of law section. Thus, having resolved the first issue in the affirmative, the only issue remaining is the appropriate discipline to impose upon respondent for his egregious conduct.

When imposing discipline, the board's responsibility is to protect the public from unfit practitioners and to preserve public confidence in the integrity of the bar. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987). In order to insure that the objectives of our disciplinary system are met, respondent must be disbarred. Respondent's conduct over the three and one-half years in question denigrated the Bar of this Commonwealth. Furthermore, the extensiveness and general pattern of respondent's commingling and conversion of entrusted funds evidences the necessity that the public be protected. As stated in *Matter of Leopold,* 469 Pa. 384, 394, 366 A.2d 227, 231-232 (1976),

"The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his pro-

fessional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement: *Davies Case,* 93 Pa. 116." (footnote omitted)

The Supreme Court's concern for the protection of the public arises from the privileged position occupied by lawyers in relation to the public within the legal sphere. *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 527-28, 426 A.2d 1138, 1142 (1981). "A client must be able to look to his attorney for sound advice; know that the attorney will pursue the client's interests vigorously and effectively; and rest assured that any financial transactions carried out on the client's behalf will be scrupulously honest, will be fully accounted for at the client's request, and will involve full and immediate payment of funds that are due and owing the client." *Id.* at 529, 426 A.2d at 1143. Respondent used his privileged position as an attorney to commingle client funds, misappropriate client funds, engage in inappropriate business transactions with clients, neglect legal matters entrusted to him, and render numerous misrepresentations. Such conduct by respondent cannot be said to have upheld the high standards of truth, candor and honesty that are required of an attorney in this Commonwealth.

Although there is no per se rule requiring disbarment for any attorney who commingled, converted, or misappropriated client funds, the board believes that the extensiveness, egregiousness and constant pattern of respondent's conduct compels his immediate disbarment. Respondent's actions during the three and one-half years in question clearly point to his untrustworthiness, dishonesty and utter disregard for his fiduciary duty to his clients and for the ethical rules of the Commonwealth of Pennsylvania. If conduct of this nature "is not immediately responded to by our disciplinary

process, we cannot hope to engender the public perception of confidence in our system." *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 585, 506 A.2d 872, 878 (1986).

Respondent's explanation that his fiduciary mishaps were the result of his inexperience and unfamiliarity with the practice of law will not be accepted as a mitigating factor. The office of an attorney does not permit the attorney's personal embarrassments to be solved by unauthorized use of fiduciary funds. *Griffith's Case,* 321 Pa. 64, 65, 184 A. 76 (1936).

In addition, it must be recalled that respondent's misconduct included more than his extensive misappropriation of client funds. As stated by the special master, "the other facts involve allegations and use of a fictitious non-existent power of attorney, of being involved in business transactions with clients, of dilatory handling of two estate administrations, of falsely claiming progress in several of the cases, of issuing NSF checks, and of receiving fees for work not performed." (Opinion of special master, p.14.) The board agrees with the conclusion of the special master that disbarment is the only appropriate sanction in this matter.

After reviewing respondent's egregious conduct, the board is of the adamant opinion that respondent is not fit to continue the practice of law in this Commonwealth. Respondent once advised clients that "if you can't trust your lawyer, who can you trust," or words to similar effect. Unfortunately, respondent's conduct will leave the public with a contrary predilection of attorneys. Respondent's attitude and behavior denigrated the integrity of the bar and demonstrated that he is an unfit and reckless practitioner from whom the public deserves protection. Therefore, respondent must be disbarred.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be disbarred.

The board further recommends that the court direct that respondent pay all the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Paris and Witherel did not participate in the adjudication.

## ORDER

And now, August 17, 1993, upon consideration of the report and recommendations of the Disciplinary Board dated June 30, 1993, it is hereby ordered that [respondent] be and he is disbarred from the Bar of this Commonwealth and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g) Pa.R.D.E.